**Joseph J. HAZELWOOD, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–3452.

Court of Appeals of Alaska.

March 15, 1996.

**1268**

Richard H. Friedman, Friedman, Rubin & White, Anchorage, for Appellant.

Cynthia M. Hora, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS, J., and HODGES, Superior Court Judge.*

## OPINION ON REMAND

BRYNER, Chief Judge.

Joseph J. Hazelwood was convicted by a jury of negligent discharge of oil. This court reversed his conviction on appeal; we held that Hazelwood was immune from prosecution and directed that the charge be dismissed. *Hazelwood v. State*, 836 P.2d 943 (Alaska App.1992). The Alaska Supreme Court subsequently reversed our decision and remanded the case to us. *State v. Hazelwood*, 866 P.2d 827 (Alaska 1993). On remand, we hold that Hazelwood's prosecution was permissible under the inevitable discovery doctrine, but we conclude that the trial court erred in ruling that certain items of evidence were admissible under the doctrine and in instructing the jury on civil, rather than criminal negligence. We thus reverse Hazelwood's conviction and remand for a new trial.

## BACKGROUND

Shortly after midnight on March 24, 1989, the *Exxon Valdez*, an oil tanker operated by the Exxon Shipping Company, ran aground on Bligh Reef, spilling eleven million gallons of oil into Prince William Sound. Joseph J. Hazelwood, the vessel's captain, was convicted by a jury of negligent discharge of oil, a class B misdemeanor. *See* AS 46.03.740; former AS 46.03.790(a).

Hazelwood appealed to this court, contending that the trial court erred in denying his motion to dismiss on grounds of immunity, in failing to suppress certain evidence of his intoxication, and in instructing the jury on the applicable culpable mental state for his offense. Hazelwood also challenged his sentence as excessive.

In *Hazelwood v. State*, 836 P.2d 943 (Alaska App.1992), we reversed Hazelwood's conviction, holding that, under Section 311 of the Federal Water Pollution Prevention and Control Act, 33 U.S.C. § 1321(b)(5) (1988), Hazelwood was entitled to use and derivative use immunity as a result of his immediate oil-spill report.[1] In reaching this conclusion, we considered and rejected two exceptions to the exclusionary rule that the trial court had invoked in finding Hazelwood's prosecution permissible despite the statutory grant of immunity he received by virtue of his oil-spill report. *Hazelwood*, 836 P.2d at 946–54.

The trial court had ruled that the prosecution's evidence derived from a source wholly independent of Hazelwood's oil-spill report and was thus admissible under the independent source doctrine. We found, however, that essentially all of the state's evidence against Hazelwood derived directly from his immunized report of the oil spill, and not from any independent source. We thus found that the record failed to support the trial court's conclusion that prosecution was permissible under the independent source doctrine. *Id.* at 948–50.

The trial court also had found that virtually all of the evidence against Hazelwood would inevitably have been discovered even if

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. At the time of the alleged offense, paragraph (b)(5) of 33 U.S.C. § 1321 required "Any person in charge of a vessel" such as the *Exxon Valdez* to notify the government immediately of "any discharge of oil or a hazardous substance from such vessel"; the paragraph went on to confer use and derivative use immunity on any person who complied with this requirement:

Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement.

*Id.*

Hazelwood had not reported the spill; the trial court thus had concluded that Hazelwood's prosecution was warranted under the inevitable discovery rule. We rejected the trial court's ruling. For purposes of our decision, we "assume[d] that ... Judge Johnstone's factual findings concerning the inevitability of the *Exxon Valdez*'s discovery are supported by the record." *Id.* at 951. We nevertheless held, as a matter of state law, that the inevitable discovery doctrine did not extend to congressionally enacted grants of immunity. *Id.* at 954.

The Alaska Supreme Court subsequently reviewed, and eventually reversed, our decision. *State v. Hazelwood,* 866 P.2d 827 (Alaska 1993). Although the supreme court affirmed our ruling that the record failed to justify application of the independent source rule in Hazelwood's case, *id.* at 831, the court held that we had erred in holding the inevitable discovery doctrine categorically inapplicable to cases of immunity. *Id.* at 834.

In reaching this conclusion, the supreme court first disapproved this court's application of Alaska law to decide the inevitable discovery issue; the court declared that federal law applied: "The scope of immunity under 33 U.S.C. § 1321(b)(5), and its constitutionally permissible exceptions, are issues of federal law. Thus United States Supreme Court precedent, rather than our own precedent, controls our resolution of this case." *Id.* at 829 n. 1.[2] The supreme court went on to decide, as a matter of federal law, that the inevitable discovery doctrine does extend to cases (like Hazelwood's) involving statutory

grants of use and derivative use immunity. *Id.* at 834. Noting that it "express[ed] no view as to the admissibility of any particular portion of the State's evidence against Hazelwood" and that "[s]uch evidentiary questions remain for resolution by the court of appeals," *id.* at 831 n. 7, the supreme court remanded the case to us for further proceedings:

> We therefore hold, in accordance with the applicable U.S. Supreme Court precedent, that the court of appeals erred in ruling that the inevitable discovery doctrine has no application in the context of this statutory grant of immunity. Since our reading of *Kastigar* and *Nix* [*v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)] impels us to the conclusion that application of the doctrine of inevitable discovery to the use and derivative use immunity provided for in 33 U.S.C. § 1321(b)(5) is permissible, we remand this case to the court of appeals for further proceedings.

*Id.* at 834.[3]

Upon remand of Hazelwood's case by the supreme court, the parties filed supplemental briefs with this court, and the case was submitted to us for renewed consideration.

## INEVITABLE DISCOVERY

■ The supreme court's decision initially calls upon us to address the inevitable discovery issue we previously left open: whether the trial court's findings applying the doctrine to Hazelwood's case are supported by

2. The supreme court also commented:
   The court of appeals appears to have weighed whether Alaska law, rather than federal law, should recognize inevitable discovery in immunity cases. *See Hazelwood,* 836 P.2d at 951 ("For present purposes, we may assume that the inevitable discovery doctrine would be adopted in Alaska in appropriate cases...."). The court's reliance on Justice Marshall's dissent in *Kastigar,* [*v. U.S.,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)], *see Hazelwood,* 836 P.2d at 952 (quoting *Kastigar,* 406 U.S. at 470–71, 92 S.Ct. at 1669–70 (Marshall, J., dis-

senting)), would be appropriate had the court of appeals been deciding Alaska law. But in this case we are interpreting federal law, and thus are bound by the acceptance of the inevitable discovery rule in *Nix* and the constitutionality of use and derivative use immunity in *Kastigar.*
   *State v. Hazelwood,* 866 P.2d at 833 n. 12.

3. The supreme court also directed us to address, as necessary, other unresolved issues that Hazelwood originally raised on appeal. *Id.* at 834 n. 15.

the record.[4] This requires a threshold consideration of the scope of the inevitable discovery doctrine itself.

As we said in our initial opinion, the inevitable discovery doctrine, as approved in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), works "to avoid suppressing illegally obtained evidence when the prosecution has demonstrated that, although its evidence actually derived from a source tainted by illegality, the same evidence would inevitably have been discovered through lawful, untainted means had the illegality not occurred." *Hazelwood v. State*, 836 P.2d at 950 (citing Wayne R. LaFave, *Search and Seizure* § 11.4(a) at 378–88 (2d ed. 1987)). Federal courts have been circumspect in in-

terpreting and applying the doctrine; they have construed it as a narrow exception to the general rule of suppression—an exception under which the hypothetical inevitability of a lawful discovery must be inferred from evidence relating to the situation actually existing at the time of the unlawful discovery, not from after-the-fact testimony speculating about what might have been had no unlawful discovery occurred.

*Nix* itself involved a situation in which the police discovered a murder victim's body after being directed to it by a defendant whose cooperation had been obtained in violation of his Sixth Amendment right to counsel. At the time of the violation, however, a lawful search in the vicinity of the body was already

---

4. On remand, citing *State v. Gonzalez*, 853 P.2d 526 (Alaska 1993), Hazelwood has argued as a preliminary matter that this court should apply the Alaska Constitution to hold that he is entitled to transactional immunity. We decline to do so for two independent reasons.

In originally considering Hazelwood's appeal, neither this court nor the supreme court interpreted his arguments to incorporate an independent state constitutional claim on this ground. *See Hazelwood v. State*, 836 P.2d at 946 n. 3; *State v. Hazelwood*, 866 P.2d at 833 n. 12. We conclude that Hazelwood's cursory mention in his original opening brief that the Alaska Constitution is "at least as extensive [as the federal constitution], and is also relied upon in this appeal" is not sufficient to preserve his current state constitutional argument. *See Wren v. State*, 577 P.2d 235, 237 n. 2 (Alaska 1978); *see also State v. Wassillie*, 606 P.2d 1279, 1281 n. 7 (Alaska 1980). Plain error review might be appropriate if the statutory grant of immunity in this case were clearly necessary to avoid constitutional problems arising from the reporting requirement. *Cf. In re L.A.M.*, 727 P.2d 1057, 1059 (Alaska 1986). However, the federal reporting requirement in this case applies to participants in a heavily regulated, licensed activity; accordingly there is substantial doubt as to whether the reporting requirement implicated Hazelwood's constitutional right against self-incrimination. *See, e.g.*, Bernard Penner, *Immunity and Oil Spill Reporting Statutes*, 3 U. Balt. J. Envtl. L. 34 (1993). We note that, since the grounding of the *Exxon Valdez*, the reporting statute has been amended to delete the derivative use immunity provision. *See* 33 U.S.C. § 1321(b)(5) (Supp. II 1990) ("Notification received pursuant to this paragraph shall not be used against any such natural person in any criminal case, except the prosecution for perjury or for giving a false statement."). In sum, the interests of justice do not call for plain error review of Hazelwood's state constitutional claim.

In any event, in reversing this court's decision, the supreme court unequivocally held that "in this case we are interpreting federal law, and thus are bound by the acceptance of the inevitable discovery rule in *Nix* and the constitutionality of use and derivative use immunity in *Kastigar*." *State v. Hazelwood*, 866 P.2d at 833 n. 12. The court further made it clear that: "The scope of immunity under 33 U.S.C. § 1321(b)(5), and its constitutionally permissible exceptions, are issues of federal law. Thus United States Supreme Court precedent, rather than our own precedent, controls our resolution of this case." *Id.* at 829 n. 1. The supreme court's decision on this point stands as the law of the case; we interpret that decision as foreclosing this court from adjudicating the merits of Hazelwood's state constitutional claim.

Hazelwood has alternatively argued that, even if this court rejects his state constitutional claim, the Alaska Supreme Court's decision in *Gonzalez* in effect precludes the state from establishing inevitable discovery in this case. Hazelwood points out that in deciding that the Alaska Constitution requires transactional immunity, *Gonzalez* expressly concluded that use and derivative use immunity can never adequately protect against the potential danger of nontestimonial use of immunized statements. 853 P.2d at 532. Hazelwood thus reasons that under *Gonzalez*, the danger of nontestimonial use must always preclude a finding of inevitable discovery.

But Hazelwood's primary and alternative arguments are simply the same top spun in different directions. These arguments both revolve around the same fundamental premise: that the Alaska Constitution assures Hazelwood protection against use and derivative use immunity. As indicated above, if Hazelwood's arguments are to be addressed at all, the Alaska Supreme Court must address them.

underway. Finding that the previously initiated search inevitably would have led to the body, the Court invoked the inevitable discovery doctrine. 467 U.S. at 449–50, 104 S.Ct. at 2511–12.

Following *Nix*'s lead, some federal courts have been willing to apply the inevitable discovery doctrine only when an investigation was already underway before the occurrence of the unlawful act in question. This line of cases, exemplified by *United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir.1984) (emphasis in original), holds that "the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the illegal conduct." [5]

Other federal courts, including those of the Ninth Circuit, have enlarged the doctrine by accepting proof that "pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later." 5 Wayne R. LaFave, *Search and Seizure* § 11.4(a), at 249–50 (3d ed. 1996). See, for example, *United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1399 (9th Cir.1989) (citation omitted): [6]

[T]his circuit does not require that the evidence be obtained from a previously

initiated, independent investigation. The government can meet its burden by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence.

Courts in this category, however, have required the government to prove the existence of "an invariable, routine procedure," *United States v. Gorski*, 852 F.2d 692, 696 (2d Cir. 1988), or to demonstrate that "policy dictated" the action that would have inevitably resulted in discovery, *United States v. Infante–Ruiz*, 13 F.3d 498, 504 (1st Cir.1994).[7] The government must show not only that the procedure would inevitably have disclosed the evidence but also that the procedure was in place and would have been followed.[8]

Absent proof that discovery of evidence was inevitable in light of either events already in progress or procedures already in place when an unlawful discovery occurred, federal courts faced with tainted evidence have uniformly declined to apply the inevitable discovery doctrine.[9] In the present case, the state has cited no federal or state rulings that apply the doctrine based on hindsight testimony concerning circumstances never in existence, actions never actually initiated, or investigative procedures never firmly in place.[10]

The federal courts' circumspection in applying the inevitable discovery doctrine is

---

**5.** *See also United States v. Seals*, 987 F.2d 1102, 1107–08 (5th Cir.1993); *United States v. Lamas*, 930 F.2d 1099, 1102–04 (5th Cir.1991); *United States v. Evans*, 848 F.2d 1352, 1358 (5th Cir. 1988); *United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir.1987); *United States v. Hernandez–Cano*, 808 F.2d 779, 783–84 (11th Cir. 1987); *United States v. Owens*, 782 F.2d 146, 152–53 (10th Cir.1986); *United States v. Cherry*, 759 F.2d 1196, 1205–06 (5th Cir.1985); *United States v. Finucan*, 708 F.2d 838, 844 (1st Cir. 1983).

**6.** *See also United States v. Zapata*, 18 F.3d 971, 978–79 (1st Cir.1994); *United States v. Perea*, 986 F.2d 633, 644 (2d Cir.1993); *United States v. George*, 971 F.2d 1113, 1121–22 (4th Cir.1992); *United States v. Horn*, 970 F.2d 728, 732 (10th Cir.1992); *United States v. Mancera–Londono*, 912 F.2d 373, 375 (9th Cir.1990); *United States v. McConnell*, 903 F.2d 566, 570 (8th Cir.1990); *United States v. Gorski*, 852 F.2d 692, 696 (2d Cir.1988); *United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir.1987); *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir.1986).

**7.** *See also Davis v. State*, 262 Ga. 578, 422 S.E.2d 546, 551 (1992) (describing required showing as one of "inevitable, routine procedure").

**8.** *See* LaFave, *supra*, at 248–50.

**9.** *See, e.g., United States v. Ornelas–Ledesma*, 16 F.3d 714, 721–22 (7th Cir.1994); *United States v. Infante–Ruiz*, 13 F.3d at 504; *United States v. Thomas*, 955 F.2d 207, 211 (4th Cir.1992); *United States v. Gorski*, 852 F.2d at 696; *United States v. Owens*, 782 F.2d at 153; *United States v. Finucan*, 708 F.2d at 844; *United States v. Allen*, 436 A.2d 1303, 1310–11 (D.C.1981).

**10.** Two federal cases specifically holding the doctrine applicable to evidence derived from immunized statements, *United States v. Streck*, 958 F.2d 141 (6th Cir.1992), and *United States v. Kiser*, 948 F.2d 418 (8th Cir.1991), are unilluminating. In neither case does the issue of extending the inevitable discovery doctrine to an immunity case appear to have been actively contested. Neither case contains any explanation of the

readily understood. Professor LaFave explains that the dangers of the doctrine are not intrinsic, but arise instead from the potential for its "application in a loose and unthinking fashion." LaFave, *supra*, at 244. LaFave thus cautions that, "[i]n carving out the 'inevitable discovery' exception to the taint doctrine, courts must use a surgeon's scalpel and not a meat axe." *Id.* For if hindsight optimism were accepted as a substitute for hard facts in proof of inevitable discovery, the prosecution could almost always find witnesses to venture confident assurances—unimpeachable in retrospect—that, but for the illegality in question, any number of steps could have, and probably would have, resulted in the discovery of the same evidence. Virtually any investigative misconduct might then be rationalized—and suppression often be avoided—by after-the-fact hypothesizing of alternative, lawful means for discovering the same evidence. So construed, the inevitable discovery exception would simply swallow the general rule of suppression.

This is clearly not what the United States Supreme Court had in mind when it decided *Nix v. Williams.* Indeed, the Court in *Nix* expressly called for the narrow forms of proof that ensuing federal decisions have exactingly required. In refusing to subject the inevitable discovery doctrine to a quantum of proof more stringent than preponderance of the evidence—the standard commonly applied in matters involving the suppression rule—the *Nix* court took pains to emphasize that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix v. Williams,* 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5.

For purposes of the present case, we must take *Nix* at face value. Thus, in reviewing the record to determine whether the trial court's inevitable discovery findings are supported, we must focus on evidence of "dem-

onstrated historical facts capable of ready verification or impeachment." The case law of the Ninth Circuit, although somewhat broader in its application of the inevitable discovery doctrine than the case law of some federal circuits, is consonant with *Nix.* Alaska finds itself situated in the Ninth Circuit. Accordingly, to the extent that federal cases evidence any conflict, we think it appropriate to take guidance from the Ninth Circuit.

As interpreted by federal case law, the inevitable discovery doctrine provides no easy cure for the problems engendered by the statutory grant of use and derivative use immunity Hazelwood received in the present case. Because Hazelwood's immunized report triggered the investigation that led to his conviction, virtually all of the prosecution's evidence derived from the initial report and fell within its cloak of statutory immunity. The trial court found, however, that virtually all of the evidence apart from Hazelwood's immunized report inevitably would have been discovered:

> The defendant's report of the grounding notwithstanding, the state inevitably would have discovered the grounding of the *Exxon Valdez* and initiated the investigatory process by not later than 12:45 a.m. on March 24, 1989. The court further concludes, based on the facts, that the investigating team of Falkenstein, Delozier, Lawn, and Fox, would have arrived at approximately the same time as they, in fact, did. Any observation made or investigation actually commenced would have been made or commenced at approximately the same time.

As a result of the inevitable discovery and the substantially identical investigation which would have occurred, the court finds that all evidence gathered was derived from a wholly independent source other than the defendant's report. Defendant's report that "evidently we're leaking some oil" will be excluded. All other evidence

---

court's reasons for deciding to apply the doctrine to an immunity situation. Both involve circumstances in which the independent investigative efforts that rendered lawful discovery inevitable

had been undertaken before immunity was granted, and in both cases the disputed evidence was evidently also admissible under the independent source rule.

will be admitted, subject to other proper objections.

Under the more restrictive federal test articulated in cases such as *United States v. Satterfield*, the trial court's inevitable discovery finding might be questioned in its entirety, since it is doubtful whether "the lawful means which made discovery inevitable were . . . being actively pursued *prior* to" Hazelwood's radioed report of the *Exxon Valdez*'s grounding. 743 F.2d at 846 (emphasis in original). The same is not true under the broader standard applied in the Ninth Circuit, which allows inevitable discovery to be predicated on proof that the evidence would have been found "by following routine procedures." *United States v. Ramirez–Sandoval*, 872 F.2d at 1399.

The *Exxon Valdez*'s passage out of Valdez was monitored by the Coast Guard's Vessel Traffic Center [the VTC] in Valdez. The vessel departed the harbor between 9:00 p.m. and 9:30 p.m. on March 23, 1989. At approximately 11:30 p.m., Hazelwood called the VTC from Rocky Point, a mandatory reporting point for vessels exiting Valdez, and obtained permission to deviate from his traffic lane to avoid ice. He informed the VTC that the *Exxon Valdez*'s estimated time of arrival at Naked Point, the next mandatory reporting point, was 1:00 a.m.; he said he would call the VTC again with a new estimated time of arrival for Naked Point after he was clear of ice. Providing an updated estimated time of arrival was evidently a usual, but not mandatory procedure. At 12:07 a.m., about a half-hour after leaving its traffic lane, the *Exxon Valdez* ran aground on Bligh Reef and began leaking oil. Hazelwood radioed the VTC to report the grounding and spill nineteen minutes later, at 12:26 a.m.

When Hazelwood's report came in, Bruce Blandford, a vessel traffic controller, was on duty at the VTC. Blandford had worked at the VTC for more than two years and had "pretty much of a feel for when people are going to call you[.]" Blandford knew that Hazelwood had said he would call with a new estimated time of arrival for Naked Point

after the *Exxon Valdez* was clear of ice. At the time he received Hazelwood's report of the grounding and spill, Blandford "was beginning to wonder why I hadn't heard from them." The *Exxon Valdez* was out of range of the VTC's radar when Hazelwood's report was received. By changing the radar settings after receiving Hazelwood's call, however, Blandford located the vessel in the vicinity of Bligh Reef. He notified his superiors.

The record is undisputed that the VTC was responsible for both tracking the *Exxon Valdez* out of Valdez and initiating an immediate investigation in the event of either a grounding or an oil spill. Blandford and other Coast Guard witnesses testified that an array of investigative options would have been available to Blandford had the *Exxon Valdez* failed to report. The record unquestionably supports the conclusion that, in the routine course of his duties, by pursuing these options, Blandford would have discovered that the *Exxon Valdez* was aground on Bligh Reef. He would then have been required to do precisely what he did upon hearing Hazelwood's own report: notify his Coast Guard supervisors. They, in turn, would have launched an immediate investigation of the grounding and spill.

Given these circumstances—particularly in light of the nature and magnitude of the events surrounding the *Exxon Valdez*'s grounding—the record clearly supports the trial court's general finding that the vast bulk of evidence at trial would inevitably have been discovered if Hazelwood had failed to report his vessel's grounding. It seems beyond reasonable dispute that, "pursuant to . . . standardized procedures or established routine," LaFave, *supra*, at 249, the Coast Guard and the state would have ended up with almost the same evidence that they acquired as a result of Hazelwood's immunized report. Thus, in large measure, the court's inevitable discovery findings must be upheld.

In two specific respects, however—the first pertaining to certain evidence surrounding Hazelwood's blood-alcohol content; the

second pertaining to the discovery of Hazelwood's own statements—the trial court's inevitable discovery findings are problematic.

Blood and urine samples were collected from Hazelwood on the morning of his vessel's grounding; these samples were subsequently tested and found to contain traces of alcohol. The precise timing of the investigation plays a critical part in resolving whether this evidence would have been inevitably discovered. As previously indicated, Judge Johnstone found that "the state inevitably would have ... initiated the investigatory process by not later than 12:45 a.m. on March 24, 1989." (That is, within approximately nineteen minutes of the time Hazelwood actually submitted his report.) This finding led the judge to further find that the same team of investigators who actually first boarded the *Exxon Valdez* would inevitably have boarded the vessel at about the same time had Hazelwood failed to report the spill.

In fixing the precise time for the inception of the investigation, Judge Johnstone relied on testimony given by Blandford and his supervisors, who all believed that, had Blandford failed to hear from the *Exxon Valdez,* he would have called the vessel before 12:45 a.m. and, failing contact by radio, would have quickly located the vessel on radar and realized it was aground. However, the testimony given by these witnesses concerning the timing of events was based on their retrospective assessment of what likely would have happened, not on the existence of a specific procedure or routine that required Blandford to call the vessel by 12:45 a.m.

As already indicated, Blandford and his superiors made it clear that the Coast Guard was responsible for tracking the *Exxon Valdez* and for investigating any failure by the vessel to maintain required communications or procedures with the VTC. And they all testified about various routine procedures— some more time-consuming than others— that were available to Blandford if a vessel did not communicate on schedule. But nobody testified that any specific priority had been established among the array of investigative options open to Blandford or, more to the point, that any then-existing procedures required Blandford to contact the *Exxon Valdez* before 12:45 a.m. if Hazelwood failed to check in.

To the contrary, Blandford readily acknowledged that the timing and choice of options was essentially a matter within his discretion and that no set procedure existed:

Q. If you lost such communication where the vessel was not responding, for whatever reason, what steps could you take to locate it?

A. If we suspected that—if we had made repeated calls to the vessel, and with no response. If he were in radar coverage area we might look to find him on the radar. We might make calls to other vessels in the area to ascertain where this vessel may be and be headed.

Commander Thomas Falkenstein, the officer to whom Blandford reported at the VTC, confirmed this testimony:

Q. You indicated that ordinarily they report but there is no set procedure if they don't report?

A. Not that I'm aware of, sir.

Hence, the testimony of Blandford and other witnesses about the likely time it would have taken to discover the grounded vessel consisted of subjectively based supposition. No evidence in the record establishes the existence of "an invariable, routine proceeding," *United States v. Gorski,* 852 F.2d at 696, from which it could be inferred that Blandford would have discovered the grounding of the *Exxon Valdez* by 12:45 a.m.; nor does the record demonstrate that such prompt action was something that "policy dictated," *United States v. Infante–Ruiz,* 13 F.3d 498, 504 (1st Cir.1994). In short, we find no "demonstrated historical facts capable of ready verification or impeachment" to support the trial court's findings that discovery no later than 12:45 a.m. was inevitable. *Nix v. Williams,* 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5.

The record amply establishes that set procedures would have led Blandford to do

*something* that would have led to his discovery of the grounding within a time frame that would inevitably have preserved investigative evidence that was not particularly time sensitive; but apart from Blandford's and others' opinions on the matter, the record does not establish precisely what he would have done and when he would have done it. Indeed, in its opening brief on appeal, the state effectively concedes the point:

> The state agrees that Mr. Blandford was not able to state precisely what steps he would have taken had Hazelwood not reported the grounding.... When one is faced by hypotheticals, the only sensible answer to questioning on how one would react is by answering that he would have considered all options and acted accordingly. Although Mr. Blandford could not testify that he would have undertaken any particular action, his testimony is clear that he inevitably would have done something which would have led to the discovery of the tanker on Bligh Reef.

Plausible as it may seem in retrospect, Blandford's testimony cannot support the trial court's finding that the *Exxon Valdez*'s grounding would inevitably have been discovered and reported within nineteen minutes of Hazelwood's actual report.

Because the precise timing of the investigation is speculative, the inevitability of obtaining blood and urine samples from Hazelwood—particularly time-sensitive evidence—cannot be established. The state argues that, even if some delay in initiating an investigation had occurred, investigators would surely have obtained blood and urine samples from Hazelwood in time to detect the presence of sufficient alcohol to allow extrapolation back to the time of the grounding—essentially the same procedure the state relied on with the samples it actually obtained. This argument misses the point: "It is important to keep in mind that the question is whether that very item of evidence would inevitably have been discovered, not merely

whether evidence roughly comparable would have been so discovered." LaFave, *supra*, at 243. Samples of blood or urine containing materially different concentrations of alcohol might have amounted to comparable evidence, permitting comparable inferences to be drawn, but they would not have been the same evidence.

Moreover, the state's argument presupposes that investigators operating on a different timeline would have been equally motivated to gather the same evidence and equally capable of obtaining it. The record supports neither of these conclusions.

For instance, Mark Delozier, the Coast Guard officer at the VTC in charge of marine casualty investigations when the grounding occurred, testified that upon boarding the *Exxon Valdez* he encountered Hazelwood on the bridge and detected an odor of alcohol on his breath. Delozier's testimony makes it clear that this observation prompted him to arrange for samples of Hazelwood's blood and urine to be obtained. No one capable of drawing blood samples was on the vessel at the time. After considerable delay, arrangements were made to bring a qualified person aboard; yet according to the record this person might not have been available had he been contacted even several minutes later. Furthermore, Hazelwood himself was the person who informed Delozier that urine specimen kits were available on board the vessel—information that led to the collection of Hazelwood's own urine sample.

Nothing in the record establishes the inevitability of a discovery comparable to Delozier's almost immediate observation of alcohol on Hazelwood's breath. And while the record might support the conclusion that investigators would sooner or later have attempted to collect blood or urine samples from Hazelwood, there is nothing to assure that they would have been as prompt or successful if their efforts were delayed or lacked the impetus provided by Delozier's initial encounter with Hazelwood.[11] By the same token, there is nothing to show that Hazelwood himself

11. Moreover, the record indicates additional uncertainty as to who if anyone might have taken

would have been as compliant and forthcoming if he had failed to report the spill and had not believed himself immune from prosecution.[12]

■ This lack of evidence weighs heavily against the state. For in order to meet its burden under the inevitable discovery rule, "the prosecution should be required 'to prove exactly how [the evidence] would have been discovered.'" LaFave, *supra*, at 248 (footnote containing citation omitted). Without evidence of the precise nature and sequence of investigative efforts that would have been undertaken had Hazelwood's report not been received, any effort to determine exactly what might have been collected from Hazelwood, or when it might have been collected, becomes a venture so speculative as to preclude confident, let alone inevitable, prediction. We conclude that, on the current record, evidence of the alcohol Delozier smelled on Hazelwood's breath and evidence stemming from the blood and urine samples Delozier subsequently obtained from him do not fall within the scope of the inevitable discovery doctrine and were improperly admitted at trial.

For somewhat similar reasons, we reach the same conclusion with regard to various statements that Hazelwood made to investigators. It is undisputed that these statements were made to or elicited by persons whose contact with Hazelwood resulted from Hazelwood's report of the oil spill. The statements thus clearly fell within the scope of the use and derivative use immunity that Hazelwood received by reporting the spill; they could be admitted under the inevitable discovery doctrine only if the state proved that it would have obtained them regardless of Hazelwood's initial report.

■ The state argues that, in the routine course of investigating the spill, it would have asked Hazelwood similar questions and would have obtained substantially the same information. But, as we have already pointed out, for inevitable discovery purposes, "the question is whether that very item of evidence would inevitably have been discovered, not merely whether evidence roughly comparable would have been so discovered." LaFave, *supra*, at 243. To meet the requirements of the inevitable discovery doctrine, it was incumbent on the state to prove, not only that it would have asked Hazelwood the same questions, but also that he would have given the same answers. *See United States v. Ramirez–Sandoval*, 872 F.2d at 1399–1400; *State v. McKendall*, 36 Or.App. 187, 584 P.2d 316, 320 (1978); *cf. United States v. Eng*, 971 F.2d 854, 860–61 (2d Cir.1992); *United States v. Roberts*, 852 F.2d 671, 676 (2d Cir. 1988).

■ According to the record, Hazelwood was aware that he was entitled to immunity from prosecution because he had immediately reported that his vessel was aground and leaking oil. Hazelwood thus had little reason

---

the disputed blood sample if any appreciable delay had occurred. As we have already noted, no one capable of drawing blood samples was initially on board the vessel. A qualified person, Coast Guard Corpsman Scott Conner, was eventually found in Valdez and flown aboard by helicopter. By the time authorities conducting the investigation managed to locate Conner, however, Conner was at the Valdez airport preparing to board a flight to Anchorage; less than an hour remained before his scheduled departure. There is nothing in the record to indicate the availability of any other qualified persons who might have substituted for Conner if he had departed for Anchorage before being located.

12. As we point out in connection with our discussion of the admissibility of Hazelwood's statements, *see* text, *infra* at ——, because Hazelwood

was aware that he was entitled to immunity from prosecution by virtue of his immediate report and thus had no reason to fear criminal prosecution, he stood to lose little by being fully cooperative when he dealt with investigators who responded to his report. Had the investigation been initiated independently of the immediate report, Hazelwood would have had no reason to consider himself immune from prosecution; consequently, he might not have been motivated to be as cooperative with investigators as he was when he believed himself immune. In particular, the record indicates that Hazelwood helped investigators locate urine sampling kits, yet nothing in the record provides assurance that he would have assisted in the same manner had he not believed himself immune from prosecution.

to fear criminal prosecution when he dealt with investigators. Had Hazelwood failed to report, he would have had no reason to consider himself immune from prosecution. One who speaks in fear of criminal prosecution is likely to be more cautious and less forthcoming than one who has been promised immunity; this is precisely why immunity is given. We cannot simply presume that Hazelwood would have made the same statements without immunity as he did after immunity had been statutorily granted. *Cf.* LaFave, *supra,* at 252–53. Here, even assuming that investigators might have asked exactly the same questions, the record contains no assurance that Hazelwood would have given exactly the same answers—or any answers at all. Hazelwood's statements are not admissible under the inevitable discovery doctrine.

The state argues that any error in admitting Hazelwood's statements against him at trial was harmless, since those statements were essentially cumulative of other evidence. Likewise, the state argues that the admission of evidence derived from Hazelwood's blood and urine samples was harmless, since the jury acquitted Hazelwood of operating a watercraft while intoxicated and thus presumably found that he was not intoxicated. Because we decide below that Hazelwood's conviction must be reversed on independent grounds, we need not consider the harmless error issue.[13]

■ As we have already held, apart from Hazelwood's statements and the evidence of intoxication derived from the taking of his blood and urine samples, the trial court was correct in finding the remaining prosecution evidence to be admissible under the inevitable discovery doctrine. Since this remaining evidence is plainly sufficient to support the charge on the offense for which Hazelwood was convicted—negligent discharge of oil—we conclude that the trial court properly ruled that Hazelwood's prosecution was not barred by immunity, and that it properly denied his motion to dismiss the charge.

In originally ruling on Hazelwood's appeal, because we decided that all of the charges against Hazelwood were barred by immunity, we did not need to resolve Hazelwood's other points on appeal. Since we have now decided that Hazelwood's prosecution was not barred by immunity, we must take up his remaining claims of error.

His first such claim—that his blood and urine samples were seized by the government in violation of state law and should therefore have been suppressed—has been rendered moot by our conclusion that this evidence was in any event erroneously admitted under the inevitable discovery doctrine. We thus turn to Hazelwood's next claim.

## CIVIL NEGLIGENCE INSTRUCTION

Hazelwood was convicted of negligent discharge of oil, in violation of AS 46.03.740 and former AS 46.03.790(a). At trial, the state proposed that the jury be given an instruction incorporating the standard definition of civil negligence. Hazelwood argued that the jury should be given a negligence instruction incorporating the Alaska criminal code's defi-

---

13. Given that this case must be remanded for a new trial, we believe it appropriate to emphasize that our disposition of the inevitable discovery issues presented in this case is based on the factual record as it now stands. At the time of the suppression hearing in the superior court, the inevitable discovery doctrine had never been adopted in Alaska, and no appellate decision by this court or the Alaska Supreme Court had addressed the doctrine except in passing. Because no ground rules for proof of inevitable discovery had been adopted in Alaska, the parties were left with no clear guidelines for structuring their presentation of evidence at the suppression hearing. We recognize that such factors may well have influenced the presentation of evidence at the original suppression hearing and may have resulted in a record that, in retrospect, is incomplete or misleading. Our ruling is not meant to preclude either party from requesting the superior court to hear additional evidence on the inevitable discovery issue. In the event of a request by either party to reopen the issue, the determination of whether and to what extent additional evidence should be received will be a matter for the superior court's discretion. We do not mean to suggest that the superior court must permit reopening of the issue if, in its view, both parties have had a full and fair opportunity to address it.

nition of criminal negligence. The trial court was persuaded by the state's argument and ruled that the offense was governed by the civil negligence standard.

Alaska Statute 46.03.740 reads:

A person may not discharge, cause to be discharged, or permit the discharge of petroleum, acid, coal or oil tar, lampblack, aniline, asphalt, bitumen, or a residuary product of petroleum, into, or upon the waters or land of the state except in quantities, and at times and locations or under circumstances and conditions as the department may by regulation permit or where permitted under art. IV of the International Convention for the Prevention of Pollution of the Sea by Oil, 1954, as amended.

At the time of the alleged crime, former AS 46.03.790(a) provided that a person who "negligently" violated any provision in chapter 46.03 of the Alaska Statutes was guilty of a class B misdemeanor; this penalty provision did not specify whether the word "negligently" referred to civil or criminal negligence.[14] On appeal, we are faced with interpreting the penalty statute's ambiguous and undefined use of the term "negligently."[15]

Over Hazelwood's objection, the court instructed the jury:

A person acts "negligently" with respect to a result described by a provision of law defining an offense when the person fails to perceive an unjustifiable risk that the result will occur; the risk must be of such a nature and degree that the failure to perceive it constitutes a deviation from the standard of care that a reasonable person would observe in the situation.

In contrast to this definition of negligence, the statutory definition of criminal negligence set forth in AS 11.81.900(a)(4) would have required the jury to find, not just that Hazelwood's conduct amounted to a "deviation" from the standard of care that a reasonable person would have observed in the same situation, but a "gross deviation" from this standard. The distinction between the two standards is highlighted by the Alaska Pattern Criminal Jury Instruction on criminal negligence, which, in addition to incorporating the statutory definition of criminal negligence, expressly cautions that criminal negligence "is something more than the slight degree of negligence necessary to support a civil action for damages and is negligence of a degree so gross as to be deserving of punishment."[16]

Hazelwood contends that the trial court erred in interpreting former AS 46.03.790(a)

**14.** Subsection (b) of former AS 46.03.790 provided that a person who knowingly violated the chapter was guilty of a class A misdemeanor. Former AS 46.03.790 was rewritten in 1990 to punish as a class C felony an unlawful discharge of 10,000 barrels or more of oil; a lesser discharge amounts to a class A misdemeanor. Ch. 141, §§ 2–5, SLA 1990. The rewritten statute now specifically provides that criminal negligence is the culpable mental state for either offense. AS 46.03.790(d).

**15.** The state maintains that use of the word "negligently" in AS 46.03.790(a) creates no ambiguity and, on its face, constitutes a reference to ordinary civil negligence rather than to criminal negligence. The state reasons that, because subsection (a) was enacted when Alaska's revised criminal code was already in effect, the legislature would have used the term "criminal negligence" if it meant to adopt a culpable state more stringent than civil negligence. We find this argument unpersuasive in context. While the use of the word "negligently" in a setting where the statutorily defined term "criminal negligence"

would normally apply might indeed signify an intent to adopt civil rather than criminal negligence, the term "criminal negligence" set forth in AS 11.81.900(a)(4) is by its own definition limited to the provisions of the revised criminal code. The definition is inapplicable to Title 46. For this reason, the legislature's use of "negligently," as opposed to "with criminal negligence," in Title 46 cannot in itself be taken as unambiguous evidence of its intent to adopt civil negligence rather than criminal negligence. Moreover, we find nothing in the context or legislative history of AS 46.03.790(a) to support the state's contention that the word "negligently" was meant as a reference to civil negligence. In these circumstances, the unadorned reference to negligence creates an ambiguity that must be resolved through statutory interpretation.

**16.** The Alaska Pattern Jury Instruction (Criminal) on criminal negligence thus provides:

A person acts with "criminal negligence" with respect to a [result] [circumstance] described by the law when the person fails to perceive a

to allow his conviction for negligent discharge of oil based on proof of civil, rather than criminal negligence. Hazelwood relies on *Speidel v. State*, 460 P.2d 77, 80 (Alaska 1969), where the Alaska Supreme Court held it impermissible to convict a person of a crime for acting "unwittingly or inadvertently or negligently," or for a "simple neglectful or negligent" act. The court indicated the need for some greater awareness or consciousness of wrongdoing. Subsequently, in *Alex v. State*, 484 P.2d 677, 681 (Alaska 1971), the court found it "imperative ... that an accused's act be other than simply inadvertent or neglectful."

The state, for its part, points to cases in which this court has approved simple negligence as an appropriate culpable mental state for a criminal act. *See Beran v. State*, 705 P.2d 1280, 1284 (Alaska App.1985); *Reynolds v. State*, 655 P.2d 1313, 1315 (Alaska App.1982). The state argues that there is nothing *per se* impermissible about simple negligence as a culpable mental state for criminal misconduct, and it urges us to construe former AS 46.03.790(a) as requiring nothing more.

Cases such as *Beran* and *Reynolds*, however, stand merely for the proposition that "simple negligence would suffice to impose [criminal] liability for a commercial violation in a heavily regulated industry." *Gregory v. State*, 717 P.2d 428, 431 (Alaska App.1986). We have recently emphasized that "our willingness to adopt negligence as the culpable mental state for ... [such] offenses indicates that this standard should be applied only for offenses dealing with heavily regulated activities for which permits or licenses are required." *Cole v. State*, 828 P.2d 175, 178 (Alaska App.1992). Even as to regulated activities that require licenses but are not commercial, such as driving, we have held

that, "in the absence of legislative direction, something greater than proof of simple negligence should be required for conviction" of a criminal offense. *Gregory*, 717 P.2d at 431.

The offense for which Hazelwood was convicted—negligent discharge of oil—was unquestionably a crime: it was classified as a class B misdemeanor and, upon conviction, entails the possibility of incarceration. *See* AS 46.03.740; former AS 46.03.790(a); AS 12.55.135(b). Although Hazelwood's conduct actually involved his participation in a commercial, heavily regulated activity for which he was required to be licensed, the statute under which Hazelwood was convicted does not restrict itself to this type of commercial activity; rather, it subjects to criminal penalties all members of the general public who discharge a broad range of common, though potentially hazardous, substances anywhere "upon the waters or land of the state except in quantities, and at times and locations or under circumstances and conditions as the department may by regulation permit." AS 46.03.740. It is the nature of the statute, and not of Hazelwood's activity, that we are concerned with here, for a statute cannot be construed to have different meanings for different defendants. Civil negligence cannot be relied on to define "standard criminal offenses such as this." *Cole*, 828 P.2d at 179. To convict Hazelwood of a crime, the jury should have been required to find him criminally negligent.

■ We thus hold that the trial court erred in instructing the jury on civil, rather than criminal negligence. This error cannot be deemed harmless, because it resulted in the jury being given an incorrect definition of an essential element of the offense. Hazelwood's conviction must therefore be re-

substantial and unjustifiable risk that [the result will occur] [the circumstance exists]. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situa-

tion. Criminal negligence is something more than the slight degree of negligence necessary to support a civil action for damages and is negligence of a degree so gross as to be deserving of punishment.

versed, and his case remanded for a new trial.[17]

## CONCLUSION

For the foregoing reasons, except as to the blood-alcohol evidence and Hazelwood's own statements, we AFFIRM the superior court's inevitable discovery findings. We hold that Hazelwood's prosecution is not barred by immunity. However, because the jury was instructed on civil, rather than criminal negligence, we REVERSE the conviction and remand for a new trial.

MANNHEIMER, J., not participating.

---

**17.** Our disposition of this case makes it unnecessary to consider Hazelwood's sentencing argument.