**Joseph J. HAZELWOOD, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3452.**

Court of Appeals of Alaska.

July 2, 1998.

Richard H. Friedman, Friedman, Rubin & White, Anchorage, for Appellant.

Cynthia M. Cooper, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and JOANNIDES, District Court Judge,* and WOLVERTON, Superior Court Judge.*

COATS, Chief Judge.

Joseph J. Hazelwood was convicted by a jury of negligent discharge of oil. We reversed his conviction on appeal, holding that Hazelwood was immune from prosecution. *Hazelwood v. State*, 836 P.2d 943 (Alaska App.1992). In *State v. Hazelwood*, 866 P.2d 827 (Alaska 1993), the Alaska Supreme Court reversed our decision, remanding the case to us. In *Hazelwood v. State*, 912 P.2d 1266 (Alaska App.1996), we concluded that Hazelwood's prosecution was permissible under the inevitable discovery doctrine but concluded that the trial court erred in finding that some items which were introduced into evidence were admissible under the inevitable discovery doctrine. We concluded that it was unnecessary for us to determine whether admissibility of these items of evidence constituted harmless error because we concluded that the trial court erred in instructing the jury that civil, rather than criminal negligence, was necessary to convict Hazelwood of negligent discharge of oil. In *State v. Hazelwood*, 946 P.2d 875 (Alaska 1997), the Supreme Court reversed our decision finding that the trial court did not err in instructing the jury that ordinary negligence was sufficient to convict under the statute. The Supreme Court remanded the case to us for consideration of any unresolved issues which were originally raised by Hazelwood on appeal. *Id.* at 886.

There are two issues which remain for us to address: (1) was it harmless error for the trial court to admit the impermissible evidence of Hazelwood's immunized statements and Hazelwood's intoxication; and (2) assuming that it was harmless error to admit this

---

* Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution.

evidence, was Hazelwood's sentence permissible? We conclude that admission of the evidence in question constituted harmless error and conclude that Hazelwood's sentence was permissible.

In reviewing whether it was harmless error for the trial court to admit evidence of Hazelwood's immunized statements and intoxication, we have assumed that we should apply the standard which courts apply when the impermissible evidence in question was obtained in violation of the defendant's constitutional rights. In those cases courts are bound by the rule of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that before a constitutional error can be held harmless, the court must be able to declare that it was harmless beyond a reasonable doubt. *See also Love v. State*, 457 P.2d 622, 633 (Alaska 1969). In determining whether there is harmless error beyond a reasonable doubt, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Billingsley v. State*, 807 P.2d 1102, 1106 (Alaska App.1991)

(citing *Chapman*, 386 U.S. at 23, 87 S.Ct. 824 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963))); *see also Braham v. State*, 571 P.2d 631, 645 (Alaska 1977).[1] We are deciding the harmless error question based upon our findings and decision in *Hazelwood v. State*, 912 P.2d 1266 (Alaska App.1996), but given the length of this litigation, we have concluded that we should decide the harmless error question based upon the record as it now stands.[2]

In *Hazelwood*, 912 P.2d at 1273–77, this court determined that, with two exceptions, the record supported the trial court's findings that the majority of the state's evidence was admissible pursuant to the inevitable discovery doctrine. The two exceptions, which this court concluded were erroneously admitted into evidence, were: (1) some of Hazelwood's own statements; and (2) some of the evidence of Hazelwood's intoxication. *Id.* at 1273–74.

In *Hazelwood*, 912 P.2d at 1276–77, this court determined that several of Hazelwood's statements were erroneously admitted into evidence.

> [W]e believe it appropriate to emphasize that our disposition of the inevitable discovery issues presented in this case based on the factual record as it now stands. At the time of the suppression hearing in the superior court, the inevitable discovery doctrine had never been adopted in Alaska, and no appellate decision by this court or the Alaska Supreme Court had addressed the doctrine except in passing. Because no ground rules for proof of inevitable discovery had been adopted in Alaska, the parties were left with no clear guidelines for structuring their presentation of evidence at the suppression hearing. We recognize that such factors may well have influenced the presentation of evidence at the original suppression hearing and may have resulted in a record that, in retrospect, is incomplete or misleading. Our ruling is not meant to preclude either party from requesting the superior court to hear additional evidence on the inevitable discovery issue. In the event of a request by either party to reopen the issue, the determination of whether and to what extent additional evidence should be received will be a matter for the superior court's discretion. We do not mean to suggest that the superior court must permit reopening of the issue if, in its view, both parties have had a full and fair opportunity to address it.
>
> *Hazelwood*, 912 P.2d at 1277 n. 13.

---

1. In *Hazelwood v. State*, 912 P.2d 1266, 1270 n. 4 (Alaska App.1996), we noted:
   > However, the federal reporting requirement in this case applies to participants in a heavily regulated, licensed activity; accordingly there is substantial doubt as to whether the reporting requirement implicated Hazelwood's constitutional right against self-incrimination.

   (Citation omitted.) In the event that the statute which required Hazelwood to report the oil spill, 33 U.S.C. § 1321(b)(5), did not implicate Hazelwood's constitutional right against self incrimination, then it would appear that we should apply the harmless error standard which applies to non-constitutional errors, which is whether the evidence in question appreciably affected the jury's verdict. *See Love v. State*, 457 P.2d 622 (Alaska 1969); *see also* Bernard Penner, *Immunity and Oil Spill Reporting Statutes*, 3 U. Balt. J. Envtl. L. 34 (1993) (distinguishing between statutes that require individuals to make potentially incriminating disclosures for regulatory purposes (such as providing information at the scene of an accident), and traditional immunity statutes intended to compel individuals to testify in criminal investigations over a claim of Fifth Amendment privilege; concluding that where the information compelled to be reported requires no more information than is necessary to respond to an emergency situation, the Fifth Amendment privilege is not triggered).

2. In that decision we pointed out:

The first disputed statements were made during Hazelwood's initial report to the Coast Guard, in which he stated in part:

Yeah, ah Valdez back, ah we've, should be on your radar there, we've fetched up ah hard aground, north of Goose Island, off Bligh Reef, and ah evidently leaking some oil and we're gonna be here for awhile and ah, if you want ah, so you're notified, over.

The tape recording of this transmission was admitted as exhibit 120 at trial. Hazelwood asserts the significance of this entire transmission is that it established that Hazelwood was on the bridge immediately after the grounding, it established the weather conditions as he perceived them, and it established the efforts he was making to try to extract the vessel from the reef.

The second disputed statement was elicited during Alaska State Trooper Michael Fox's testimony. Fox testified:

I told [Hazelwood] who I was, and I was representing the state, and that I was helping with the investigation into cause, why it happened, and I said, "Well, what the heck is the problem?" and he said, "You're lookin' at it."

Hazelwood argues that this statement could be construed as an admission of his guilt, which is what the state argued in closing argument.

The final group of disputed statements occurred during an interview of Hazelwood that Coast Guard Chief Warrant Officer Mark Delozier conducted. The tape of the interview was admitted into evidence and played for the jury. Hazelwood points to the following statements that he made during the interview which he asserts are prejudicial: that he had a beer at the Pipeline Bar before boarding the *Valdez;* that after the pilot left, he assumed the "con" of the vessel; that he altered course outside of the shipping lane; that he left the bridge without leaving explicit instructions for the third mate as to when to turn back into the lane; and that he made a mistake in overestimating the third mate's abilities. Hazelwood points out that during closing argument, the prosecutor characterized Hazelwood's statement to Delozier as an admission and argued that Hazelwood ac-knowledged responsibility for the negligent discharge of oil.

We acknowledge that, in general, a defendant's own words, admitting responsibility for an offense, can have a very damaging effect against the defendant. *See Cole v. State,* 923 P.2d 820, 832 n. 20 (Alaska App. 1996) (quoting *Arizona v. Fulminante,* 499 U.S. 279, 292, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), for the premise that "A defendant's confession is probably the most probative and damaging evidence that can be admitted against him[.]"); *Collazo v. Estelle,* 940 F.2d 411, 424 (9th Cir.1991) (en banc) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)) ("[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted.... Certainly, confessions have profound impact on the jury[.]' "); *Motta v. State,* 911 P.2d 34, 40 (Alaska App.1996) (quoting *Fulminante,* 499 U.S. at 296, 111 S.Ct. 1246) (explaining that "[e]ven in the face of powerful independent proof of guilt, the defendant's inculpatory description of the offense 'may tempt the jury to rely upon that evidence alone in reaching its decision.' ").

In the instant case, however, Hazelwood's statement that he accepted responsibility for the grounding is cumulative of similar admissible evidence that the state introduced, which also established that Hazelwood accepted responsibility for the grounding. Exxon employee Paul B. Myers testified that after the grounding, he spoke with Hazelwood. Hazelwood told Meyers that he was not on the bridge at the time the ship went aground. Meyers testified:

[Hazelwood] indicated that this had happened and that it was his fault, he was to blame, he had just gone down to do some paperwork when this had happened and that he should have been on the bridge.

Given this statement, we do not believe that there was a reasonable possibility that Hazelwood's other statements might have contributed to his conviction. The fact that Hazelwood merely repeated that the incident was his fault and that he should not have left the bridge had negligible evidentiary impact.

In response to these statements, Hazelwood's attorney argued that as captain, Hazelwood believed it was his responsibility to take the blame for the incident; the statement did not indicate that Hazelwood was negligent.

The state introduced significant independent evidence of Hazelwood's specific conduct before the grounding and argued that this conduct constituted a lack of due care. Hazelwood's statements added nothing to the independent evidence which the state presented regarding how the incident came about. Most of this evidence, except for the evidence concerning Hazelwood's level of intoxication at the time of the grounding, was undisputed. The only evidence that was not cumulative of properly admitted evidence was personal information about Hazelwood (such as his home address), the admission of which is not prejudicial to Hazelwood. The question before the jury was whether Hazelwood's actions constituted negligence. We are convinced that there was no reasonable possibility that the evidence of Hazelwood's erroneously admitted statements contributed to his conviction.

■■■ In *Hazelwood*, 912 P.2d at 1273–74, we concluded that the trial court erroneously admitted testimony concerning Hazelwood's intoxication. Specifically, Coast Guard Officer Delozier testified regarding what he observed when he boarded the *Exxon Valdez.* He testified that he "observed a strong odor of alcohol coming from Captain Hazelwood." Similarly, Coast Guard Lieutenant Commander Thomas Falkenstein testified that he noticed "an obvious smell" of alcohol on Hazelwood's breath when he arrived at the bridge.

Furthermore, the state presented evidence of Hazelwood's blood-alcohol and urine-alcohol levels on the morning of March 24, 1989 (the grounding occurred during the early morning hours of March 24, 1989). Coast Guard Health Services technician Scott Conner took Hazelwood's blood sample at approximately 10:20 or 10:30 a.m. At roughly the same time, Hazelwood provided Delozier with a urine sample. Dr. Michael Peat testified that CompuChem Laboratories tested the samples. The tests revealed that Hazelwood's blood contained .061 percent weight

per volume of alcohol. Hazelwood's urine contained .094 percent weight per volume of alcohol. The state introduced the results of these tests into evidence.

At trial the state presented testimony of Dr. Richard Prouty which was based upon this inadmissible evidence. Dr. Prouty explained alcohol elimination rates in the human body. Dr. Prouty calculated what Hazelwood's alcohol level would have been at the time of the grounding using various elimination rates. He testified that assuming Captain Hazelwood weighs approximately 170 pounds and is about six feet tall, if Hazelwood stopped drinking at 8 p.m. and his blood alcohol concentration was .06 at 10:30 the following morning, his blood alcohol concentration at 12:05 a.m. (the time of the grounding) would have been at least .10, using various elimination rates. He further testified that alcohol impairs a person's judgment and decision making process.

The jury acquitted Hazelwood on the charge of operating a vessel while intoxicated. As the state points out, the erroneously admitted evidence of Hazelwood's intoxication was not the only evidence that the state presented establishing that Hazelwood had consumed alcohol the night before the grounding. The state also presented the testimony of witnesses who stated that Hazelwood had consumed alcohol on March 23, 1989. Chief Engineer Jerry Glowacki testified that he met Hazelwood and radio operator Gerald Roberson at the Pipeline Club around 4:00 p.m., on March 23, 1989. Glowacki testified that each man had at least one alcoholic beverage; he believed Hazelwood was drinking vodka. Moreover, marine pilot William Murphy, who had piloted the *Valdez* up until Rocky Point, testified that prior to leaving the vessel, he had a conversation with Hazelwood on the bridge. During the conversation Murphy noticed an odor of alcohol on Hazelwood's breath.

In contrast, defense counsel argued that alcohol did not play any role in the incident. Defense counsel acknowledged that Hazelwood consumed alcohol the night before the incident, but argued that Hazelwood had "four [drinks] at the most." Defense counsel argued that Hazelwood was not impaired by

the drinks, and pointed out to the jury that twenty-one witnesses testified that Hazelwood displayed no signs of intoxication when he boarded the ship. It was therefore uncontested that Hazelwood had consumed alcohol the night before the incident. There was also a significant amount of testimony from which the jury could try to ascertain whether Hazelwood was impaired by alcohol. As the state points out, the fact that the jury acquitted Hazelwood of operating the *Exxon Valdez* under the influence of alcohol demonstrates that the jury was clearly not convinced beyond a reasonable doubt that Hazelwood was intoxicated. The charge of which Hazelwood stands convicted, negligent discharge of oil, does not require the state to show that Hazelwood was intoxicated. The decision facing the jury was whether Hazelwood's decisions before the grounding of the *Exxon Valdez* were negligent and resulted in the negligent discharge of oil. The jury's decision turned on whether the actions which Hazelwood took constituted negligence.

The state introduced a significant amount of evidence showing Hazelwood's conduct before the grounding. For instance, the state introduced evidence that Hazelwood put the vessel on autopilot and directed that the vessel be brought up to sea speed while the vessel was on a direct course for Bligh Reef. The state introduced evidence that Hazelwood left the bridge while the vessel was out of the southbound lane of traffic to avoid ice. The state introduced evidence that Hazelwood left the vessel in control of the third mate, who did not have the necessary pilotage endorsement for Prince William Sound. The state elicited third mate Gregory Cousin's testimony regarding the minimal instructions that Hazelwood gave Cousins before Hazelwood left the bridge. The state introduced evidence that Hazelwood allowed helmsman Robert Kagan to steer the vessel after having discussed with his junior officers, earlier that month, that Kagan had problems steering the vessel.

The state's evidence showing Hazelwood's actions prior to the grounding was virtually uncontested by the defense. The parties vigorously disputed, however, whether Hazelwood's conduct constituted negligence. The state elicited opinion testimony that Hazelwood's various actions prior to the grounding constituted "bad judgment" and recklessness. The state then argued that Hazelwood's conduct was negligent. In contrast, while Hazelwood did not dispute what his conduct was before the grounding, he asserted that he gave routine directions to crewmen who it was reasonable for him to believe were competent, qualified persons, and he argued that this conduct was reasonable. The main question for the jury to resolve, consequently, was not what Hazelwood did prior to the grounding, but whether his conduct was negligent.

While the state elicited evidence of Hazelwood's consumption of alcohol as a possible explanation for why Hazelwood acted as he did, the ultimate issue remained whether Hazelwood's decisions and conduct prior to the grounding were negligent. We conclude that there is no reasonable possibility that the erroneously admitted evidence of Hazelwood's intoxication affected the jury's decision of whether Hazelwood's actions were negligent. Accordingly, the erroneous admission of the evidence was harmless beyond a reasonable doubt.

■ Hazelwood next contends that Superior Court Judge Karl S. Johnstone imposed an impermissible sentence. At the time Hazelwood committed the offense, negligent discharge of oil was a class B misdemeanor. *See* AS 46.03.790.[3] The maximum sentence for a class B misdemeanor is ninety days imprisonment. AS 12.55.135(b). The maximum fine that may be imposed is $1,000. AS 12.55.035(b)(4). Judge Johnstone was authorized to impose both a sentence and a fine if he so chose. *See* AS 12.55.015(a)(1)(A) and (4). Judge Johnstone sentenced Hazelwood to serve ninety days in jail and pay a $1,000 fine, or, in the alternative, to perform 1,000 hours of community work service. He was also ordered to pay $50,000 in restitution.

Hazelwood argues that Judge Johnstone did not have the authority to impose 1,000

---

3. This statute has subsequently been changed and criminally negligent discharge of oil is now a class A misdemeanor or a class C felony, depending on the amount discharged.

hours of community work service because that many hours of community work service would not be permitted under Alaska law.

Alaska Statute 12.55.100(a)(4) states:

While on probation and among the conditions of probation, the defendant may be required to perform community work in accordance with AS 12.55.055.

Alaska Statute 12.55.055(c) and (d) state:

(c) The court may offer a defendant convicted of an offense the option of performing community work in lieu of a fine, surcharge, or portion of a fine or surcharge if the court finds the defendant is unable to pay the fine. The value of community work in lieu of a fine is $3 per hour.

(d) The court may offer a defendant convicted of an offense the option of performing community work in lieu of a sentence of imprisonment. Substitution of community work shall be at a rate of eight hours for each day of imprisonment. A court may not offer substitution of community work for any mandatory minimum period of imprisonment or for any period of a presumptive term of imprisonment.

Both parties agree that under these statutes the maximum fine for Hazelwood's offense, $1,000, can be valued at 333.3 hours of community work service. The parties also agree that the maximum prison sentence for Hazelwood's offense, ninety days, can be equated to 720 hours of community work service.

Hazelwood argues that the 1,000 hours of community work service is excessive, because it exceeds both the maximum number of hours that could be imposed for a fine, or a sentence, alone. The state points out that even if the court accepts Hazelwood's analysis that AS 12.55.055(c) and (d) impose a limit on the court's ability to impose community work service, the court had the authority to impose *both* a fine and imprisonment for the offense. The court's authority to impose both a fine and imprisonment would authorize it to impose over 1,000 hours of community work service in lieu of the fine and imprisonment.[4] We find the state's argument persuasive. Even if we were to adopt Hazelwood's view that AS 12.55.055 limited the amount of community work service which the trial court could impose, the 1,000 hours of community work service did not exceed the amount which the court could impose under the statute.

The conviction and sentence are AFFIRMED.

MANNHEIMER and STEWART, JJ., not participating.

---

4. The state also points out that, in the event that Hazelwood concludes that the conditions of probation are unduly severe, he has the right to refuse probation and demand that the court impose sentence. *See State v. Staael,* 807 P.2d 513, 516 (Alaska App.1991).