**In re the EXXON VALDEZ**

**This Order Relates to All Cases.**

**No. A89–0095–CV (HRH).**

United States District Court,
D. Alaska.

Dec. 9, 2002.

*ORDER No. 358*

HOLLAND, District Judge.

*Renewed Motion for Reduction of Punitive Damages Award*

Defendants Exxon Mobil Corporation (D–1) and Exxon Shipping Company (D–2), hereinafter referred to as "Exxon", have filed a renewed motion for reduction or remittitur of the punitive damages award entered against them.[1] The motion is opposed by the plaintiffs.[2] Exxon has replied.[3] Various affidavits in support of and in opposition to the motion as well as the underlying record have been considered by the court, and oral argument has been requested and heard.

### Facts

Terrible things have happened in Alaska on Good Friday. On Good Friday, March 27, 1964, the strongest earthquake ever recorded in North America literally relocated the seabed of most of Prince William Sound and the Kenai Peninsula. On Good Friday, March 24, 1989, the oil tanker *Exxon Valdez* was run aground on Bligh Reef in Prince William Sound, Alaska.

On March 24, 1989, Exxon's co-defendant, Joseph Hazelwood, was in command of the *Exxon Valdez*. He was assisted by a third mate and a helmsman. Captain Hazelwood was a skilled mariner, but he was an alcoholic. Worse yet, he was a relapsed alcoholic; and, before departing Valdez, Alaska, on March 23, 1989, he had, more probably than not, consumed sufficient alcohol to incapacitate a nonalcoholic. As the *Exxon Valdez* exited Valdez Arm, Captain Hazelwood assumed command of the vessel from a harbor pilot and made arrangements to divert the vessel from the normal shipping lanes in order to avoid

---

1. Clerk's Docket No. 7487.

2. Clerk's Docket No. 7501.

3. Clerk's Docket No. 7535.

considerable ice which had calved off Columbia Glacier. That diversion from the standard shipping lanes took the vessel directly toward Bligh Reef. The captain gave the third mate explicit, accurate orders which, if carried out by the third mate, would have returned the vessel to the shipping lanes without danger of grounding on Bligh Reef. The third mate, who had completed the requirements for a captain's license, was, more probably than not, overworked and excessively tired at the time in question. He neglected to commence a turn of the vessel at the point where, and the time when, he had been directed to do so. At that critical time, Captain Hazelwood had left the bridge to attend to paperwork. When the third mate realized that he had proceeded too far in the direction of Bligh Reef, he commenced a turn, but it was too late.

Like so many great tragedies, this one occurred when three or more unfortunate acts and/or omissions took place in close proximity to one another, and but for any one of them, the grounding would likely not have occurred. Joe Hazelwood was under the influence of alcohol. Instead of staying on the bridge to verify that his orders were carried out, he tended to paperwork below. The third mate, being overworked and tired, neglected to carry out the orders which he had been given. The grounding might still have been avoided but for several other converging circumstances: the captain had put the vessel on an automated system for increasing its speed prior to completing the maneuver around the ice in the shipping lane; and the third mate, upon realizing his oversight, did not turn the vessel as sharply as he might have.

It has never been established that there was any design, mechanical, or other fault in the *Exxon Valdez*. It responded to its human masters as intended and expected. Thus it is entirely clear why the *Exxon Valdez* grounded on Bligh Reef: the cause was pure and simple human frailty.

Defendant Exxon Shipping owned the *Exxon Valdez*. Exxon employed Captain Hazelwood, and kept him employed knowing that he had an alcohol problem. The captain had supposedly been rehabilitated, but Exxon knew better before March 24, 1989. Hazelwood was being watched by other Exxon officers. They knew that he had "fallen off the wagon." Nothing was done about it. As a consequence, Captain Hazelwood was *the* person in charge of a vessel as long as three football fields and carrying 53 million gallons of crude oil. Exxon officials well knew that oil and fisheries could not mix with one another. Exxon officials knew that carrying huge volumes of crude oil through Prince William Sound was a dangerous business, yet they knowingly permitted a relapsed alcoholic to direct the operation of the *Exxon Valdez* through Prince William Sound.

Captain Hazelwood came to the bridge immediately after the grounding. He timely reported to the United States Coast Guard:

> *Exxon Valdez* [calling Valdez Traffic Control]. We should be on your radar there. We've fetched up hard aground north of Goose Island off Bligh Reef and evidently leaking some oil and we're gonna be here for a while.... [4]

Despite the fact that he was aware of oil boiling up through the seawater on both sides of the vessel, Captain Hazelwood attempted to extract the vessel from the reef.[5] Had he succeeded in backing the

---

**4.** Plaintiffs' Exhibit 92A, Excerpts of Record, Vol. II—Trial Exhibits, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**5.** Transcript of Trial Testimony of Joseph J. Hazelwood at 439, Excerpts of Record, Vol.

I—Trial Transcript, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

vessel off the reef or driving it across the reef, the *Exxon Valdez* would probably have foundered, risking the loss of the entire cargo and the lives of those aboard. However, the vessel was really hard aground. It could wiggle but not be moved off Bligh Reef.

The best available estimate of the crude oil lost from the *Exxon Valdez* into Prince William Sound is about 11 million gallons. In the days following the grounding, about 42 million gallons of crude oil were lightered off the *Exxon Valdez* by other tankers. This process was very dangerous. The lightering process was necessarily taking place in a pool of crude oil. A spark from static electricity or other mechanical or electrical sources might have set fire to the crude oil.

The crude oil lost from the *Exxon Valdez* spread far and wide around Prince William Sound, mostly in a westerly direction. Counter-currents which pass through the sound in a westerly direction (the primary North Pacific currents flow from west to east) took the crude oil past numerous islands, spreading to the coast of the Kenai Peninsula, Cook Inlet, and Kodiak Island. Commercial fisheries throughout this area were totally disrupted. Lands and vessels were heavily oiled. Subsistence fishing by residents of Prince William Sound and Lower Cook Inlet villages was disrupted, as were recreational activities throughout the area. Shore-based businesses dependent upon the fishing industry were disrupted. The resources of cities such as Cordova were substantially disrupted.

In keeping with its legal obligations, Exxon undertook a massive cleanup effort.[6] Approximately $2.1 billion was ultimately spent in efforts to remove the spilled crude oil from the waters and beaches of Prince William Sound, Lower Cook Inlet, and Kodiak Island. Also in accordance with its legal obligations attendant to spilling crude oil,[7] Exxon undertook a voluntary claims program, ultimately paying out $303 million, principally to fishermen whose livelihood was disrupted for the year 1989 and ensuing years up to 1994.

*Proceedings*

Litigation over the grounding was soon commenced. The civil suits came first, but developed slowly because of their number and complexity. Both the United States Government and the State of Alaska sued Exxon for environmental damage. That litigation was expeditiously settled by means of consent decrees under which Exxon agreed to pay to the governments, for environmental damage, $900 million over a period of ten years.[8] The decrees contain an "opener" provision, allowing the governments to make additional claims of up to $100 million for environmental damage not known when the settlements were reached.[9]

Captain Hazelwood was prosecuted by the State of Alaska for operating a watercraft while intoxicated, reckless endangerment, negligent discharge of oil, and three felony counts of criminal mischief. That litigation became involved in legal complexities which led to multiple appeals. Some nine years after the grounding, a

**6.** *See* 33 U.S.C. § 1321, which imposes a duty upon an owner or operator of a vessel that spills oil to clean up its discharge.

**7.** AS 46.03.822.

**8.** *United States v. Exxon Corp.*, No. A91–0082–CV (Clerk's Docket No. 46 at 7–8), and *Alaska*

*v. Exxon Corp.*, No. A91–0083–CV (Clerk's Docket No. 26 at 7–8).

**9.** *See* Consent Decree and Agreement at 18–19, Clerk's Docket No. 46 in *United States v. Exxon Corp.*, No. A91–0082–CV, and Clerk's Docket No. 26 in *Alaska v. Exxon Corp.*, No. A91–0083–CV.

single misdemeanor conviction was affirmed on appeal.[10]

Exxon was prosecuted by the federal government for various environmental crimes: violating the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1); violating the Refuse Act, 33 U.S.C. §§ 407 and 411; violating the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a); violating the Ports and Waterways Safety Act, 33 U.S.C. § 1232(b)(1); and violating the Dangerous Cargo Act, 46 U.S.C. § 3718(b). Exxon Corporation pled guilty to one count of violating the Migratory Bird Treaty Act. Exxon Shipping pled guilty to one count each of violating the Clean Water Act, the Refuse Act, and the Migratory Bird Treaty Act. They were jointly fined $25 million and were ordered to pay restitution in the amount of $100 million.[11]

The civil cases were ultimately (but with a few exceptions) consolidated into this case. Municipal claims and some Native corporation claims were tried in state court.[12] In the consolidated cases, there never was any dispute as to Exxon's liability for compensatory damages. Only the amount of the plaintiffs' losses was controverted. As a consequence of procedural orders in this case and the excellent, cooperative approach taken by counsel for all parties, an effective and efficient trial protocol for the plaintiffs' collective damage claims was developed. As the time for trial grew near, this court became convinced of the necessity of creating a single, punitive damages claims class.

By agreement with the parties, trial as regards Exxon's and Captain Hazelwood's liability for punitive damages was commenced on May 2, 1994. In this Phase I of the trial, the jury found Exxon and Captain Hazelwood to be liable for punitive damages.

Phase II of the trial dealt with compensatory damages. In Phase IIA, the jury returned a verdict in favor of fishermen in the amount of $287 million. Phase IIB, a separate aspect of the compensatory claims having to do with Native claims, was settled without trial for $22.6 million.

Phase III of the trial focused upon the amount of punitive damages which should be imposed upon the defendants. As a predicate or base for the punitive damages trial, the parties entered into a stipulation regarding impacts from the oil spill which was read to the jury at the beginning of Phase III.[13] The stipulation outlined the actual damages that had been resolved in Phase IIB of the trial and the actual damages that were to be resolved in Phase IV of the trial and in Alaska state court proceedings. The damage estimates outlined in the stipulation exceeded $350 million. The jury was, of course, also aware that it had awarded $287 million in damages in Phase IIA of the trial.

---

10. *State v. Hazelwood,* 946 P.2d 875 (Alaska 1997); *State v. Hazelwood,* 866 P.2d 827 (Alaska 1993); and *Hazelwood v. State,* 962 P.2d 196 (Alaska App.1998).

11. *See* Judgments at Clerk's Docket Nos. 235 and 236 in *United States v. Exxon Corp.,* No. 90–0015–CR.

12. More or less simultaneously with the trial in this case, a state court civil trial involving several Native corporations was conducted. The jury awarded the corporations almost $6 million in damages. *Chenega Corp. v. Exxon Corp.,* 991 P.2d 769, 774 (Alaska 1999). The trial court offset pretrial settlements and payments against the jury award. *Id.* at 775. Because the pretrial payments exceeded the jury award, final judgments were entered by which the corporations "took nothing" from Exxon. *Id.* Very recently, a straggling case involving six Alaska communities was tried in state court to a defense verdict. The cities were unsuccessful in their efforts to recover from Exxon for alleged additional expenses incurred by them as a consequence of the oil spill.

13. *See* Clerk's Docket No. 5634.

In consultation with counsel, unusually detailed punitive damages instructions were developed for purposes of this case. The jury was instructed that punitive damages are awarded for the purposes of punishment and deterrence,[14] and the fact that it had found the defendants' conduct reckless did not require it to award punitive damages.[15] The jury was specifically instructed to use reason in setting the amount of punitive damages and that any award of punitive damages should bear a reasonable relationship to the harm caused the members of the plaintiff class by the defendants' misconduct.[16] Factors that the jury was told it could consider in setting an amount of punitive damages includ-

ed the reprehensibility of the defendants' conduct,[17] the amount of actual and potential harm suffered by the members of the plaintiff class as a result of the defendants' conduct, and the financial condition of the defendants.[18] However, the jury was instructed that it should not count any damage to natural resources or the environment in general when assessing the harm suffered by members of the plaintiff class.[19] The jury was also instructed that it could consider as mitigating factors the existence of criminal fines or civil awards against the defendants for the same conduct and the extent to which the defendants had taken steps to remedy the consequences of the oil spill[20] and to prevent

**14.** *See* Jury Instruction No. 22:
The purposes for which punitive damages are awarded are:
(1) to punish a wrongdoer for extraordinary misconduct; and
(2) to warn defendants and others and deter them from doing the same.
Clerk's Docket No. 5890.

**15.** *See* Jury Instruction No. 20, which in pertinent part, reads: "The fact that you have determined that the conduct of Joseph Hazelwood and of the Exxon defendants was reckless does not mean that you are required to make an award of punitive damages against either one or both of them." Clerk's Docket No. 5890.

**16.** *See* Jury Instruction No. 25, which in pertinent part reads:
the amount of punitive damages may not be determined arbitrarily. You must use reason in setting the amount.... [A]ny punitive damages award must have a rational basis in the evidence in the case. A punitive damages award may not be larger than an amount that bears a reasonable relationship to the harm caused to members of the plaintiff class by a defendant's misconduct.... Also, the award may not be larger than what is reasonably necessary to achieve society's goals of punishment and deterrence.
Clerk's Docket No. 5890.

**17.** The jury was instructed, however, that "[t]he fact that you have found a defendant's

conduct to be reckless does not necessarily mean that it was reprehensible...." *See* Jury Instruction No. 30, Clerk's Docket No. 5890.

**18.** *See* Jury Instruction No. 27, which reads in pertinent part:
In determining the amount of punitive damages to award, if any, you may consider, among other factors:
(a) the degree of reprehensibility of the defendants' conduct,
(b) the magnitude of the harm likely to result from the defendants' conduct, as well as the magnitude of the harm that has actually occurred, and
(c) the financial condition of the defendants.
Clerk's Docket No. 5890.

**19.** *See* Jury Instruction No. 29, which reads in pertinent part: "In determining the harm caused by the oil spill, you should not consider any damage to natural resources or to the environment generally[.]" Clerk's Docket No. 5890.

**20.** *See* Jury Instruction No. 36, which reads in pertinent part:
In considering whether an award of punitive damages is appropriate in this case, and, if so, in what amount, you may consider whether a defendant has paid other criminal fines or civil penalties. You may also consider whether a defendant has

another oil spill.[21]

The Phase III trial was relatively short, lasting only five days, but the jury deliberated for approximately twenty-two days before returning a verdict. The jury awarded a breath-taking $5 billion in punitive damages against the Exxon defendants, and $5,000.00 against Captain Hazelwood.

There was to be a Phase IV of the civil litigation. The Phase IV claims embodied all of the compensatory damage claims remaining in federal court and not included in Phase II. As to these claims, a settlement was reached in the amount of $13.4 million.

Exxon moved for a reduction or remittitur of punitive damages.[22] That motion was denied.[23]

### Appeal and Remand

Once a final judgment was entered,[24] Exxon appealed. Exxon sought and obtained a stay of execution on the judgment by posting a *supersedeas* bond in the amount of $6,750,000,000.00.[25] On appeal, Exxon contended first that *punitive damages ought to have been barred as a matter of law*. For reasons given, the court of appeals rejected this contention, concluding that:

the Clean Water Act does not preempt a private right of action for punitive as well as compensatory damages for damage to private rights.... [W]hat saves plaintiff's case from preemption is that the $5 billion award vindicates only private economic and quasi-economic interests, not the public interest in punishing harm to the environment.

*In re Exxon Valdez*, 270 F.3d 1215, 1231 (9th Cir.2001).

Exxon's second contention was that the plaintiffs' burden of proof should be to produce clear and convincing evidence of liability for punitive damages. The court of appeals held that this court did not abuse its discretion by employing the preponderance of the evidence standard. *Id.* at 1232–33. Similarly, this court was affirmed as regards its instructions to the jury concerning Exxon's vicarious liability for the conduct of its employees. *Id.* at 1235. Exxon did not challenge the substance of the court's instructions as to the determination of punitive damages; for, with prescient skill, counsel for plaintiffs and Exxon had proposed instructions which appropriately informed the jury as to what have become the "guideposts" for fixing punitive damages: the reprehensibility of defendant's conduct, the relationship of punitive damages to actual and

---

made payments for compensatory damages, settlements, and incurred other costs and expenses of remedial measures. You may also consider the extent to which a defendant has been subjected to condemnation or reproval by society as a result of other means, such as loss of standing in the community, public vilification, loss of reputation, and similar matters.
*Clerk's Docket No. 5890.*

**21.** *See* Jury Instruction No. 35, which reads in pertinent part, that "[i]n considering whether an award of punitive damages is appropriate in this case, and, if so, in what amount, you should consider steps taken by a defendant to prevent recurrence of the conduct in ques-

tion—in this case, another oil spill." Clerk's Docket No. 5890.

**22.** Clerk's Docket No. 5970.

**23.** Clerk's Docket No. 6234.

**24.** Judgment as to Phases I and III was entered September 16, 1994. Clerk's Docket No. 5891. That judgment was vacated. Clerk's Docket No. 6055. A final judgment was entered September 24, 1996, Clerk's Docket No. 6911, and an amended judgment was entered January 30, 1997, Clerk's Docket No. 6966.

**25.** Clerk's Docket No. 6914.

potential harm, and comparison to other penalties.

Captain Hazelwood and Exxon both challenged the sufficiency of the evidence to support an award of punitive damages against them. The Ninth Circuit Court concluded that there was substantial evidence to support a jury verdict of liability for punitive damages as to both Captain Hazelwood and Exxon. *Id.* at 1237–38.

Finally, with liability concluded, the court of appeals turned to Exxon's challenge of the $5 billion punitive damages award against it. In addition to passing muster under the sufficiency of the evidence test, punitive damages awards must now be subjected to a due process analysis which flows from the decision of the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *BMW*, the Supreme Court held that a $2 million punitive damages award [26] based upon $4,000 in compensatory damages for pure economic loss was unconstitutional because the defendant lacked fair notice of so severe a punitive award. *Id.* at 574–75, 116 S.Ct. 1589. The importance of the *BMW* factors in determining the outer constitutional limits of punitive damages was reinforced in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).[27]

Based upon *BMW*, the Ninth Circuit Court of Appeals in this case reiterated the three guideposts established by the Supreme Court for use in determining whether punitive damages are so grossly excessive as to constitute a violation of due process. The guideposts are:

(1) the reprehensibility of the defendant's conduct; (2) the ratio of the award to the harm inflicted on the plaintiff; and (3) the difference between the award and the civil or criminal penalties in comparable cases.

*In re Exxon Valdez*, 270 F.3d at 1240. The court of appeals recognized that this court did not have the benefit of *BMW* and *Cooper Industries* when it decided Exxon's original motion to reduce the punitive damages award and in this case remanded "for the district court to consider the constitutionality of the amount of the award in light of the guideposts established in *BMW*." *Id.* at 1241. However, the court of appeals also provided its analysis of the *BMW* factors "to aid" the court in its consideration of the constitutional question. *Id.* In the end, the court of appeals unequivocally told this court that the "$5 billion punitive damages award is too high to withstand the review we are required to give it under *BMW* and *Cooper Industries*" and "[i]t must be reduced." *Id.* at 1246 (citations omitted).

**26.** The jury awarded Dr. Gore $4 million in punitive damages, which the Alabama Supreme Court reduced to $2 million.

**27.** The issue in *Cooper Industries* was "whether the Court of Appeals applied the wrong standard of review in considering the constitutionality of the punitive damages award." *Cooper Industries*, 532 U.S. at 426, 121 S.Ct. 1678. The Ninth Circuit had applied an abuse of discretion standard; the Supreme Court held that the constitutionality of punitive damages required *de novo* review and

remanded the case to the appellate court to apply the appropriate standard. Although the constitutional issue was not before the Court, it nonetheless applied the *BMW* factors and found several potential problems with a punitive damages award of $4.5 million versus a compensatory damages award of $50,000. On remand, the Ninth Circuit Court of Appeals reduced the punitive damages award to $500,000. *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 285 F.3d 1146, 1152 (9th Cir.2002).

## Discussion

Since the Supreme Court's decision in *BMW*, the Supreme Court and various courts of appeal have considered and applied the *BMW* factors. The only significant Supreme Court case was *Cooper Industries*, discussed above.[28] Courts of appeal faithfully cite the three *BMW* factors and then apply them, with varying results. The courts of appeal have shown some consistency on the reprehensibility factor, perhaps because the Court provided some guidance in *BMW* as to how to apply this factor. The courts of appeals have also fairly consistently looked to legislative determinations to ascertain comparable sanctions for the third *BMW* factor, although some circuits have remarked on the difficulty of comparing a violation of common law tort duties with statutory penalties. *See, e.g., Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*, 181 F.3d 446, 468 (3d Cir. 1999), and *Continental Trend Resources, Inc. v. OXY USA, Inc.*, 101 F.3d 634, 641 (10th Cir.1996). As for the second *BMW* factor, a review of post-*BMW* cases reveals that courts are willing to find a wide variety of ratios constitutionally acceptable. The Ninth Circuit has found a 28–to–1 ratio acceptable. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 818–19 (9th Cir.2001). The Eleventh Circuit found a 100–to–1 ratio acceptable. *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1338–39 (11th Cir.1999). By the same token, in many cases involving large compensatory damages awards, the ratios found to be permissible are much smaller. *See, e.g., United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1232–33 (10th Cir.2000) ($58.5 million in punitive damages compared to $67 million in compensatory damages, a ratio of .87–to–1); *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1350 (Fed.Cir.2001) ($50 million in punitive damages compared to $15 million in compensatory damages, a ratio of 3.33–to–1). In the end, a review of the post-*BMW* cases provides little guidance to this court as it considers the constitutionality of the $5 billion punitive damages awarded in the instant case in light of the *BMW* guideposts. *In re Exxon Valdez*, 270 F.3d at 1241.

## Application of BMW—Punishable Interests

Little mention is made in current punitive damages jurisprudence about Section II of *BMW* [29] wherein the United States Supreme Court discusses how deterrence and punishment fit into the constitutional concept that grossly excessive awards of punitive damages offend due process requirements. *BMW*, 517 U.S. at 568–574, 116 S.Ct. 1589. In *BMW*, the Court found it was first necessary to identify "the scope of Alabama's legitimate interests in punishing BMW and deterring it from future misconduct." *Id.* at 568, 116 S.Ct. 1589. In *BMW*, it was conceded that Dr. Gore was endeavoring to achieve national punishment and deterrence. For reasons explained, the Supreme Court held that Alabama's interests, not those of the entire nation, were the proper scope of deterrence and punishment.

Most of the courts considering the constitutionality of punitive damages awards have ignored this first step in the analysis.[30] In *In re Exxon Valdez*, the Ninth

---

28. In the seven other post-*BMW* Supreme Court cases, the Court remanded to a lower court for reconsideration of the punitive damages award in light of the *BMW* decision.

29. *But see White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir.2002), which was published as this order was being finalized.

30. Both the Tenth and Eleventh Circuits have expressly stated that *BMW* requires a two-step analysis, with the three "guideposts" falling

Circuit Court did not expressly delineate between the first and second aspects of *BMW*. That it would not have done so probably flows directly from the circumstances of this case. The plaintiffs' claims for punitive damages expressly excluded consideration of harm to the environment. These claims were pursued and vindicated by consent decrees in favor of the State of Alaska and the United States Government. Here, the plaintiffs' focus has always been upon what happened in Prince William Sound, Lower Cook Inlet, and the environs of Kodiak Island. While brought under both state and federal law, the focus of plaintiffs' complaints have always had to do with Alaska fisheries, Alaska businesses, Alaska property (both real and personal), and, to the extent that potential claims have been involved, they too have Alaskan roots. No one has contended that Exxon should be deterred from any particular conduct somewhere outside of Alaska, nor that it should be punished for conduct not having a direct nexus with the grounding of the *Exxon Valdez* on Bligh Reef in Prince William Sound.

In consideration of the foregoing, this court concludes that the plaintiffs in making their claims, this court in instructing the jury, and the jury in awarding punitive damages, were all focused upon the appropriate, relevant interests for which deterrence and punishment through punitive damages is permissible. This conclusion, of course, does not address the question: How much is enough? This court, like the court of appeals, will take up that subject in the course of evaluating the *BMW* guideposts.

Before moving on, and as a part of the first phase of the *BMW* analysis, further comment about the court's instructions on punitive damages may be in order. In

*BMW*, the Supreme Court was concerned that punitive damages were determined with reference to an inappropriate set of interests. It is equally important that punitive damages be determined in the first instance with reference to appropriate factors. Here, given the jurisprudential changes which took place between the time this court first evaluated the $5 billion punitive damages award and the Ninth Circuit Court's review of the same, there could have been an absence of appropriate instructions to the jury or unintended misdirection as to how punitive damages should be determined by the jury. As discussed above, Exxon had its opportunity for input to those instructions, its opportunity to challenge those instructions, and we all have the results of that inquiry before us at the present time. The court's substantive jury instructions as to the determination of punitive damages were unchallenged. Nevertheless, given the nature of the present inquiry, it strikes the court as important to know and be mindful in understanding the second phase of the *BMW* analysis (the guideposts) that the trial jury in this case was, by and large, working with the very same concepts embodied within the *BMW* guideposts as set out above. The jury was instructed on the purpose of punitive damages: punishment and deterrence. The jury was admonished not to be arbitrary: punitive damages must have a rational basis in the record and bear a reasonable relationship to harm done or likely to result from the defendant's conduct. The jury also was instructed on the subjects of reprehensible conduct and consideration of mitigation (as by voluntary payments) and some comparison to other available sanctions.

into the second step. *Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235, 1252–53 (10th Cir.2000);

*Johansen*, 170 F.3d at 1333.

**1054**

Without proper instructions, jury verdicts are patently suspect. Here, we know that the trial jury, in making an award of $5 billion for punitive damages, was seeking to vindicate—through punishment and deterrence—the appropriate plaintiff interests, and not other interests such as environmental concerns which had been separately dealt with and which the jury was expressly told not to consider. In short, this is not a situation where the jury awarded $5 billion in punitive damages based upon one script, with this court second-guessing their work using a different script.

There is yet another consideration which, in the view of this court, should precede analysis of the *BMW* factors, for it too goes to the kind of question posed in the first aspect of *BMW*. In *BMW*, the United States Supreme Court was concerned that Dr. Gore was endeavoring to impose his view of things upon the nation, not just Alabama. *BMW* might have been sued and punitive damages sought in other jurisdictions. Here, Exxon was exposed to a multiplicity of claims, most but not all of which were pending in this court. But for the creation of a mandatory punitive damages class, Exxon was exposed to the risk of multiple punitive damages awards flowing from the same incident.[31] Where multiple suits for punitive damages have been brought, it strikes this court that there is a very real risk that two punitive damages awards in different courts, but based upon the same incident, would involve a considerable risk of doubling up on deterrence and punishment. How this concern is to be managed under *BMW* is not clear. What is clear is that the risk does not exist in this case. Because of the mandatory

punitive damages class, the court can say with complete confidence that Exxon has not been exposed to excessive deterrence or punishment because of multiple suits for punitive damages. It follows that the whole of what is constitutionally foreseeable for purposes of due process is fairly put to the *BMW* test of whether $5 billion in punitive damages was or was not grossly excessive.

### Application of BMW—Factors

*Reprehensibility.* The court considers first the quality of defendants' conduct which led the trial jury to find liability for punitive damages.

Punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."

*In re Exxon Valdez,* 270 F.3d at 1241 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

This factor is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award...." *BMW,* 517 U.S. at 575, 116 S.Ct. 1589. In the end, the punitive damages award must "not be 'grossly out of proportion to the severity of the offense.'" *Id.* at 576, 116 S.Ct. 1589 (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). The trial jury was expressly instructed to consider "the degree of reprehensibility of the defendants' conduct."[32]

The reprehensibility of a party's conduct, like truth and beauty, is subjective. One's view of the quality of an actor's

---

**31.** Indeed, claims against Exxon were being tried at virtually the same time in both the United States District Court for the District of Alaska and the Superior Court for the State of Alaska.

**32.** Jury Instruction No. 27, Clerk's Docket No. 5890.

conduct is the result of complex value judgments. The evaluation of a victim will vary considerably from that of a person not affected by an incident. Courts employ disinterested, unaffected lay jurors in the first instance to appraise the reprehensibility of a defendant's conduct. Here, the jury heard about what Exxon knew, and what its officers did and what they failed to do. Knowing what Exxon knew and did through its officers, the jury concluded that Exxon's conduct was highly reprehensible.

█ In a case decided less than a month before this case, the Ninth Circuit Court of Appeals observed that the Supreme Court had outlined what has been termed the "hierarchy of reprehensibility":

> acts and threats of violence [are] at the top, "followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence."

*Swinton,* 270 F.3d at 818 (quoting *Florez v. Delbovo,* 939 F.Supp. 1341, 1348–49 (N.D.Ill.1996) (citing *BMW,* 517 U.S. at 575–76, 116 S.Ct. 1589)). These are objective criteria which the court employs to evaluate the jury's subjective appraisal of the quality of a defendant's conduct. With due deference to the jury process, verdicts should not be upset unless the jury result is grossly excessive in light of the objective evaluation of a defendant's conduct.

Some aspects of the quality of Exxon and Captain Hazelwood's conduct *vis-a-vis* the plaintiffs are pretty straightforward. The defendants' conduct was (a) criminal, but (b) non-violent. As set out above, the Exxon defendants pled guilty to violations of three federal environmental statutes. Captain Hazelwood was ultimately convicted of the state crime of negligent discharge of oil. Non-violent crimes are patently less serious than crimes of violence. The grounding of the *Exxon Valdez* and the consequential spilling of crude oil was not intentional. Captain Hazelwood's purpose just prior to the grounding was to avoid Bligh Reef, not park on it. The defendants' conduct did not involve trickery or deceit. There was no effort on the part of Exxon to hide what happened.[33]

It is undisputed that Exxon understood and well knew the risks attendant to transporting crude oil out of Valdez, Alaska, and through Prince William Sound. Moreover—and these additional facts make Exxon's conduct very reprehensible—Exxon knew that Captain Hazelwood was an alcoholic, it knew that he had resumed drinking, and it knew that Captain Hazelwood was drinking while on duty. Driving under the influence of alcohol is a crime anywhere in the country. Exxon knew that Captain Hazelwood was drinking and driving the crude oil tanker *Exxon Valdez* and did nothing about it.

The court of appeals observed in this regard that Exxon's knowledge "goes

---

**33.** Hiding a 900–foot vessel capable of carrying more than 53 million gallons of crude oil—even in so large a body of water as Prince William Sound—would not have been possible. More to the point, however, Exxon not only made no effort to hide what happened but, rather, Captain Hazelwood reported the incident to the Coast Guard immediately.

Throughout these proceedings, plaintiff W. Findlay Abbott has contended that far more than 11 million gallons of crude oil were actually spilled from the *Exxon Valdez* into Prince William Sound. The court has repeatedly rejected these contentions for lack of any substantial evidence to support Mr. Abbott's contentions. For example, his *qui tam* action, *United States ex rel. Abbott v. Exxon Corp.,* No. 96–00041–CV, was dismissed by this court and that dismissal was affirmed by the Ninth Circuit Court of Appeals, 182 F.3d 930 (Table) (1999 WL 313320) (9th Cir.1999). There is no reliable evidence in the record that a larger spill was covered up by Exxon.

more to justify punitive damages than to justify punitive damages at so high a level." *In re Exxon Valdez,* 270 F.3d at 1242. Certainly Exxon's knowledge that Captain Hazelwood was drinking and driving the *Exxon Valdez* is an important, perhaps the most important, reason why the jury found and the court of appeals affirmed Exxon's liability for punitive damages. But, as the last-quoted observation of the circuit court implies, the extent of Exxon's knowledge may also be a consideration in the characterization of the quality of Exxon's conduct.

Here we are concerned about due process and what Exxon should reasonably have anticipated as punishment for wrongful conduct. There is a direct nexus between what Exxon should reasonably have expected as punishment and the extent of its knowledge of Captain Hazelwood's situation. It is one thing to knowingly employ a recovering alcoholic. It is quite another—a far more serious matter—to have knowingly and intentionally allowed Captain Hazelwood to continue as the master of the *Exxon Valdez* despite his relapse. Some Exxon representatives contended that Captain Hazelwood was the most watched person in the fleet, and he may have been. Exxon officials nevertheless ignored the information that was at their disposal, leaving Captain Hazelwood to operate a huge tank vessel through Prince William Sound, a body of water known for its valuable fishing and recreational resources. This is not someone hauling dry cargo, the spilling of which would have minimal impact on the fisheries and other

uses of Prince William Sound. Rather, this is an employer deliberately permitting a relapsed alcoholic to continue operating a vessel carrying over 53 million gallons of volatile, toxic, crude oil. In the view of this court, the decision to leave Captain Hazelwood in command of the *Exxon Valdez* was highly reprehensible.

Exxon's and Captain Hazelwood's conduct was determined by the jury to have been reckless. In evaluating the reprehensibility guidepost, the court of appeals observes that the spill "did not kill anyone." *In re Exxon Valdez,* 270 F.3d at 1242–43. That statement is true based upon the record of this case. What it does not say, however, is that Exxon's decision to leave Captain Hazelwood in command of the *Exxon Valdez* recklessly put the captain himself, his crew, and all of his rescuers in harm's way. After its grounding, the *Exxon Valdez* was sitting in a pool of oil. Rescuers had to enter that pool of oil. Careless smoking of tobacco or an electrical or electro-static spark might have ignited the crude oil and incinerated everyone in the vicinity.[34]

Finally, Captain Hazelwood, for whom Exxon is responsible, did not just ground the *Exxon Valdez.* Perhaps because of judgment impaired by alcohol, but in the face of knowledge that the vessel had been holed and was rapidly losing crude oil into Prince William Sound, he endeavored to maneuver the vessel. The record reflects that this was a dangerous undertaking, one which might have taken a vessel from a point of more or less stability into a pos-

---

**34.** As an example, Captain William J. Deppe, who took over command of the *Exxon Valdez* after Captain Hazelwood was relieved of his duty, explained that:

> when we were pumping oil from the top like that, oxygen could come in through the openings ... and we would create an explosive atmosphere between the void space, the deck and the oil. By putting the tools

and lines and equipment down there, we could get a spark, and if we had an explosive atmosphere, you could blow up the ship.

Transcript of Trial Testimony of William J. Deppe at 7206, lns. 15–20, Excerpts of Record, Vol. I—Trial Transcript, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

ture where a great deal more oil might have been spilled. Indeed, the vessel might have foundered. Exxon's claims program certainly mitigated the reprehensibility of its conduct. But in the view of this court, what might have happened as the result of a careless cigarette or an electrical failure on the grounded vessel or so simple an occurrence as an electrostatic discharge when hoses are being connected or disconnected to a vessel appreciably aggravates Exxon's conduct.

■ Punitive damages " 'should reflect the enormity of [the defendant's] offense....' " *In re Exxon Valdez*, 270 F.3d at 1241 (quoting *BMW*, 517 U.S. at 575, 116 S.Ct. 1589). On the *BMW* hierarchy of reprehensibility, Exxon's conduct, while not reaching the top, falls just short. Its conduct was criminal. Exxon's decision to leave Captain Hazelwood in command of the *Exxon Valdez* demonstrated reckless disregard for the livelihood, health, and safety of the residents of Prince William Sound, the crew of the *Exxon Valdez*, and others. Exxon's conduct was highly reprehensible.

*Ratio.* The second indicium of an unreasonable or excessive punitive damages award is its ratio to the harm inflicted on the plaintiff. *BMW*, 517 U.S. at 580, 116 S.Ct. 1589. There must be a reasonable relationship between exemplary damages and compensatory damages. *Id.* The compensatory side of the ratio is made up of two components: actual harm to the victim and the harm that was likely to occur. *Id.* at 581, 116 S.Ct. 1589. The trial jury was expressly instructed to consider the magnitude of "actual" and "likely" harm.[35]

There is no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *BMW*, 517 U.S. at 583, 116 S.Ct. 1589. In *Haslip*, 499 U.S. at

23, 111 S.Ct. 1032, the Supreme Court found a 4–to–1 ratio "close to the line." In *TXO*, a 10–to–1 ratio was upheld. *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). In *BMW*, the Court stated that "[w]hen the ratio is a breathtaking 500 to 1 ... the award must surely 'raise a suspicious judicial eyebrow.' " *BMW*, 517 U.S. at 583, 116 S.Ct. 1589 (quoting *TXO*, 509 U.S. at 481, 113 S.Ct. 2711). Although it noted in this case that a 4–to–1 ratio has been found to be close to the line, the Ninth Circuit Court of Appeals has upheld far greater ratios in other cases. *See, e.g., Swinton*, 270 F.3d at 818–19 (28–to–1 ratio), and *Leatherman*, 285 F.3d at 1152 (10–to–1 ratio). Plainly, the ratio is "somewhat indeterminate." *In re Exxon Valdez*, 270 F.3d at 1243.

Not only is the ratio somewhat indeterminate, but also harm likely to occur and "potential harm" are often not subject to precise calculation. *TXO*, 509 U.S. at 460, 113 S.Ct. 2711. In *TXO*, the United States Supreme Court observed that "[i]t is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." *Id.* (emphasis in original). Clearly this court is not restricted to the jury's compensatory award in evaluating the ratio guidepost. Moreover, in another case flowing from the grounding of the *Exxon Valdez* (*Sea Hawk Seafoods, Inc. v. Exxon Corp.*, 246 F.3d 676 (Table) (2000 WL 1860726) (9th Cir.2000)), the Ninth Circuit Court held that Western Alaska Fisheries, Inc., a seafood processor that did not file an independent lawsuit against Exxon, could nevertheless share in the class action punitive

**35.** Jury Instruction No. 27, Clerk's Docket No. 5890.

damages award on the same basis as other, eligible, seafood processors. The court of appeals stated that "[u]nder federal law, including federal maritime law, punitive damages are available to any person or entity that suffered actual injury arising from a defendant's violation of a federally protected right, independent of whether legal injury is established at trial." *Id.* 2000 WL 1860726, at *2. If this be true, then it also follows that claimants who were dismissed from this case and were not awarded any compensatory damages could also share in the punitive damages award if they suffered some actual injury that involved a "federally protected right." [36] In addition, there are plaintiffs' claims, dismissed by this court, which have been reinstated by the court of appeals. *See In re Exxon Valdez,* 270 F.3d at 1253.[37] All of these claimants certainly have "potential" for adding to the harm side of the ratio.

As to actual harm—the compensatory damages associated with the grounding of the *Exxon Valdez*—the parties differ sharply. Exxon contends that the actual harm number for purposes of ratio calculation can be no higher than $20.3 million, which is the amount of the two compensa-

tory judgments against Exxon. Exxon contends that all other payments it made were pre-judgment payments or settlements, which the court of appeals has said do not count for purposes of calculating actual harm.[38] If pre-judgment payments or settlements do not reduce actual harm, Exxon contends that the actual harm number is $369.4 million.[39] This number represents $354 million in payments by Exxon and $15,436,371 paid to the plaintiffs by the Trans–Alaska Pipeline Liability Fund (TAPL Fund).[40]

The plaintiffs contend that the actual harm component of total compensatory damages is $517.2 million. This number is based on actual judgments and recoveries obtained by eight distinct categories of plaintiffs from Exxon and the TAPL Fund.[41]

The court finds that the best indicators of actual, compensatory damages in this case are the following items:

(1) $287,000,000 Phase II jury verdict [42]

(2) $9,515,000 paid by Exxon to Native corporation owned seafood processing operations [43]

---

**36.** The court of appeals has not made it clear what federally protected right entitled Western Alaska Fisheries to participate in the punitive damages award.

**37.** Specifically, the claims of tender boat operators and crews, cannery workers, and 34 seafood processors were reinstated.

**38.** Exxon also argues that most of its pre-judgment payments could not reasonably be treated as compensation for actual harm caused by the oil spill because Exxon's prompt payment of claims protected the plaintiffs from economic loss that might have otherwise occurred. Whether Exxon's pre-judgment payments represent "actual" harm or harm that might otherwise have occurred is ultimately irrelevant since the court must consider both harms for purposes of calculat-

ing a ratio. *BMW,* 517 U.S. at 581, 116 S.Ct. 1589.

**39.** Declaration of John F. Daum at 4, ¶ 8, attached to Notice of Filing Original Declaration, Clerk's Docket No. 7540.

**40.** *Id.* at 2, ¶ 5, and 3–4, ¶ 7[a].

**41.** *See* chart summarizing judgments and recoveries at page 39 of Plaintiffs' Opposition, Clerk's Docket No. 7501.

**42.** The precise amount the jury awarded was $286,787,739.22. *See* Minutes from the United States District Court (Aug. 11, 1994), Clerk's Docket No. 5716.

**43.** Amended Stipulation Regarding Impacts for Phase III at 5, Part III, ¶ 5, Clerk's Docket No. 5634.

(3) $113,500,000 paid to other commercial fish processors [44]

(4) $6,000,000 paid to the Seattle Seven fish processors [45]

(5) $4,000,000 paid to fish processors by TAPL Fund [46]

(6) $20,000,000 paid by Exxon to members of the Native class [47]

(7) $2,600,000 paid by Exxon to Native class members who opted out [48]

(8) $17,790,510 net paid to Native corporations by TAPL Fund (after reimbursement by corporations to the Fund; Native corporations reimbursed the Fund $7.4 million) [49]

(9) $3,254,576 paid by Exxon to Native corporations [50]

(10) $152,275 Tatitlek state court jury verdict [51]

(11) $592,500 in other settlements to Native corporations [52]

(12) $8,521,667 paid by Exxon to municipalities and villages [53]

(13) $974,000 in additional settlements to municipalities and villages [54]

(14) $724,000 state jury verdict for Kodiak Island Borough [55]

(15) $1,340,178 paid BY TAPL Fund to municipalities and villages [56]

(16) $1,500,000 received by municipalities and villages as part of the State of Alaska's recovery against Alyeska [57]

(17) $13,400,000 Phase IV settlement [58]

(18) $4,071,694 paid by TAPL Fund to cannery workers, tenders, and seafood brokers [59]

**44.** *Id.* at ¶ 6.

**45.** 1996 Settlement Agreement at 4, Part II, ¶ A, Exhibit 16 to Oesting Declaration which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**46.** *See* Exhibit C to Daum Declaration, which is appended to Defendants' Reply, Clerk's Docket No. 7535.

**47.** Amended Stipulation Regarding Impacts for Phase III at 2, Part I, ¶ 1, Clerk's Docket No. 5634.

**48.** *See* Order No. 307 (Jan. 19, 1996), Clerk's Docket No. 6600.

**49.** *See* Daum Declaration at 3, ¶ 6, which is appended to Notice of Filing Original Declaration, Clerk's Docket No. 7540, and Exhibit C to his declaration, which is attached to Defendants' Reply, Clerk's Docket No. 7535. *See also,* Oesting Declaration at 7, ¶ 13, and 10, ¶ 15, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**50.** *See* Memorandum from W. Monte Taylor at 53 (Mar. 20, 1992), attached as Exhibit 19 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**51.** Oesting Declaration at 9, ¶ 14, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**52.** *See* Exhibits 21 and 22 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**53.** *See* Taylor Memorandum at 53, attached as Exhibit 19 to Oesting Declaration, and Exhibit 24 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**54.** *See* Exhibits 25, 26, and 27 attached to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**55.** *See* Exhibit 28 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

**56.** *See* Oesting Declaration at 8, ¶ 13, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501. This number should probably be slightly lower as it likely includes interest.

**57.** *See id.* at 11, ¶ 16.

**58.** *See id.* at 12, ¶ 17.

**59.** *See id.* at 13, ¶ 18. This number probably includes interest and so should be slightly lower.

(19) $11,964,793 paid by Exxon to cannery workers, tenders, and seafood brokers [60]

(20) $388,596 paid by Exxon to area businesses [61]

(21) $219,305 paid by TAPL Fund to area businesses.[62]

These figures represent a total actual harm of $507,509,094.

Laying aside briefly the question of whether it is possible to place a number on the likely or potential harm flowing from the grounding of the *Exxon Valdez*, this court turns now to what it has found to be the most troubling aspect of the decision of the court of appeals in *In re Exxon Valdez*. Without citation of authority, and without explanation that has a nexus to the due process-fair notice issue which underlies the question of whether or not punitive damages are grossly excessive, the court of appeals observes with respect to the ratio analysis that:

> The amount that a defendant voluntarily pays before judgment should generally not be used as a part of the numerator, because that would deter settlements prior to judgment.

*In re Exxon Valdez*, 270 F.3d at 1244.[63]

The briefing of the parties and the court's independent research suggest that authority in support of the foregoing proposition is nonexistent, and what sparse authority does exist reaches a contrary conclusion. In *Kelley v. Michaels*, 59 F.3d

1050 (10th Cir.1995), the court dealt with an actual damage award of $292,750.00 and a punitive damages award of $500,000.00. However, the net actual damages recovered by the plaintiff were only $2,750.00 because of an offset of $290,000.00 which was the result of a partial settlement of the plaintiff's claim. The Tenth Circuit employed the $292,750.00 compensatory award in calculating the ratio of harm to punitive damages. *Id.* at 1055. A similar result is to be found in *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219 (10th Cir.2000), where the district court reduced a compensatory award made by a jury but did not reduce the punitive award. There, also, the Tenth Circuit rejected the argument that because the district court reduced the compensatory award to prevent a double recovery to the plaintiff, the punitive award should also be reduced. *Id.* at 1231 n. 6. Thus, in determining harm for the second *BMW* factor (the ratio), the Tenth Circuit added back into the compensatory award those damages that had been subtracted out because of a double recovery. *Id.* at 1231.

As already noted, the court of appeals' reason for suggesting the subtraction of voluntary payments was because to do otherwise would, in the view of the appellate court, deter settlements prior to judgment. This court does not understand how or why encouraging settlements should be a part of the due process analysis of a puni-

---

60. *See id.*

61. *See* Exhibit 30 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

62. Oesting Declaration at 13, ¶ 19, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

63. Following the suggestion that the court should generally discount compensatory damages by the amount of voluntary payments or settlements, the court of appeals goes on (as a

part of its discussion of the ratio) to speak of cleanup expenses, observing that they "should be considered as part of the deterrent already imposed." *In re Exxon Valdez*, 270 F.3d at 1244. But cleanup costs have to do with environmental damage, and the jury was precluded from considering that harm in making its award of punitive damages. In this case, environmental harm and deterrence of it should stand apart from other harms and the punishment and deterrence of them.

tive damages award made in a case which went to trial. Moreover, this court believes that a contrary argument is more logical. If a defendant knows that it will get credit for a partial settlement, voluntarily made before trial, it may be encouraged to go to trial; whereas, as a general proposition the specter of a large punitive damages award is a very powerful factor in encouraging settlements of entire cases. Reducing the risk of going to trial on punitive damages by discounting them for voluntary payments does not encourage settlements, it encourages trials.

■ In this case, the general rule adopted by the circuit should not apply. A reduction of the harm factor based upon voluntary payments is not appropriate. This position is not taken because of this court's view of how discounting harm for voluntary payments might impact the settlement process, but because of the specific punitive damages instructions given the jury in this case.

Generally, punitive damages instructions are very open-ended as regards how juries should come up with a punitive damages number if liability for such damages is determined. For example, the Ninth Circuit Model Civil Jury Instruction for punitive damages provides as to the amount of punitive damages only that:

> If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice or sympathy toward any party. In considering punitive damages, you may consider the degree of reprehensibility of the defendant's con-

duct and the relationship of any award of punitive damages to any actual harm inflicted on the plaintiff.[64]

In instructing the jury in this case, and as set out fully in marginal notes above, the parties went far beyond the norm in endeavoring to give the jury guidance on how to determine punitive damages. In those instructions, the jury was specifically admonished to take account of mitigating factors. It was instructed that it could "consider whether a defendant has made payments for compensatory damages, settlements, and incurred other costs and expenses of remedial measures."[65]

In arguing this case to the jury, the plaintiffs sought punitive damages of more than $5 billion and less than $20 billion.[66] The jury plainly did not buy plaintiffs' top-dollar analysis of how punitive damages should be calculated in this case. The court presumes that the jury followed and faithfully applied, to the best of their ability, the court's instructions. *See Leatherman*, 285 F.3d at 1150 ("we must presume the jury understood and followed the instructions"). Presumably the jury already considered whether and to what extent punitive damages should be mitigated based on voluntary payments by Exxon before judgment. Reducing actual harm for purposes of ratio analysis by the amount of voluntary payments unfairly skews the ratio in Exxon's favor, and in effect gives Exxon double credit for voluntary payments by reducing both punitive damages and actual harm for purposes of the punitive damages/harm ratio analysis. In this case, the court concludes that it should not discount actual harm by voluntary payments made by Exxon.

---

**64.** Ninth Circuit Model Civil Jury Instruction No. 7.5.

**65.** Jury Instruction No. 36, Clerk's Docket No. 5890.

**66.** *See* Transcript of Proceedings, Trial by Jury—70th Day, at 7587, lns. 23–25 (Aug. 29, 1994), Clerk's Docket No. 5778. Plaintiffs' counsel reiterated twice that the number should be more than $5 billion but something less than $20 billion.

The court turns now to its analysis of harms that have not been or cannot be quantified. In this case, there was harm that was purely non-economic; there was harm which likely occurred but has not yet been valued; and there was potential harm—all flowing from the grounding of the *Exxon Valdez.*

Firstly, there are some 32,677 punitive damages claimants.[67] These claimants did not get deceived about the quality of the paint on a new car. The most direct and palpable effect of Exxon's recklessness was upon the livelihood of Prince William Sound, Cook Inlet, and Kodiak area fishermen. In this regard, the court of appeals observed that:

> Although the huge oil spill obviously caused harm beyond the "purely economic," the punitive damages award was expressly limited by the instructions to exclude environmental harm. . . .

*In re Exxon Valdez,* 270 F.3d at 1242. Laying aside that environmental damage, the effects of the spilling of 11 million gallons of crude oil into Prince William Sound, as the court of appeals observed, were not purely economic. The social fabric of Prince William Sound and Lower Cook Inlet was torn apart. "[R]esearch on the community impacts of the *Exxon Valdez* Oil Spill clearly delineate a chronic pattern of economic loss, social conflict, cultural disruption and psychological stress." [68] Communities affected by the spill "reported increased incidences of alcohol and drug abuse, domestic violence, mental health problems, and occupation related problems." [69] Also, several studies found that a high percentage of affected fishermen suffered from severe depression, post-traumatic stress disorder, generalized anxiety disorder or a combination of all three.[70] The spilling of 11 million gallons of crude oil into Prince William Sound and Lower Cook Inlet disrupted the lives and livelihood of thousands of claimants and their families. That harm cannot be quantified.

Secondly, there are plaintiffs whose claims have been reinstated in *In re Exxon Valdez.* Their damages have not yet been determined. Plaintiffs estimate damages to these plaintiffs to be between $77 million and $125 million.[71] Putting a number on these claims would be speculative,

---

67. *See* Plaintiffs' Response to Court's Requests at Oral Argument at 4, Clerk's Docket No. 7553. This number includes claimants whose claims are based on recreational uses or commercial fishing activities in unoiled commercial fisheries. These claimants may be entitled to punitive damages under the Ninth Circuit's holding in *Sea Hawk Seafoods,* 246 F.3d 676 (Table) (2000 WL 1860726). *But see* Exxon's Memorandum with Respect to Plaintiffs' Response to Court's Questions, Clerk's Docket No. 7561.

Here, the court discusses likely or potential harm, so use of the number of claimants potentially entitled to receive punitive damages seems most appropriate.

68. J. Steven Picou, *et al., Community Recovery From the Exxon Valdez Oil Spill: Mitigating Chronic Social Impacts* at 6–7, attached as Exhibit 4 to Declaration of David W. Oesting,

which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

69. Duane A. Gill, *Environmental Disaster and Fishery Co–Management in a Natural Resource Community: Impact of the Exxon Valdez Oil Spill, in Folk Management in the World's Fisheries* 227 (Dyer & McGoodwin, eds., 1994), pertinent part attached as Exhibit 5 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

70. *See* Plaintiffs' Opposition at 24, n. 20, for a complete list of the relevant studies, Clerk's Docket No. 7501. Pertinent portions of the studies are attached as Exhibits 4 and 6 through 9 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

71. Plaintiffs' Opposition at 40, Clerk's Docket No. 7501.

even though the harm is very likely to have occurred.

Thirdly, and in the area of potential harm, there is no way of calculating how much additional oil might have spilled into Prince William Sound and spread elsewhere had Captain Hazelwood's efforts to back the *Exxon Valdez* off Bligh Reef succeeded. Here, the risk of more extensive losses to the plaintiffs and the enhanced risks to the *Exxon Valdez* crew and its rescuers is immense and incalculable.[72] Moreover, the court views Exxon as having been fairly on notice that a serious accident in Prince William Sound could lead to the total loss of the vessel and its entire cargo of crude oil.

 Because there is no way to quantify the non-economic, likely or potential harms discussed above, the appropriate approach is to proceed with the ratio calculation, but to accommodate the unknowns by allowing a higher ratio to pass muster.[73] This is in keeping with Supreme Court precedent. In *BMW*, the Court observed that "[a] higher ratio may . . . be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW*, 517 U.S. at 582, 116 S.Ct. 1589. If, as the court presently finds, the quantifiable harm in this case is $507.5 million, then the $5 billion punitive damages award in this case gives a 9.85-to-1 ratio. This result does not exceed the 10-to-1 ratio which was upheld by the United States Supreme Court in *TXO*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366.[74] Even if this case is viewed as one involving primarily economic harm, a ratio under 10-to-1 is in line with the general rule set forth by the Tenth Circuit in *Continental Trend Resources*, 101 F.3d at 639, which is cited affirmatively by the Ninth Circuit in *Neibel v. Trans World Assur. Co.*, 108 F.3d 1123, 1132 (9th Cir. 1997) (" 'From [*BMW*] we surmise that in economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio.' "). This case involves far more than the quantified economic injuries, so a punitive-damages-to-dollars ratio of under 10-to-1 was appropriate under extant Ninth Circuit Court authority.

"Ratio analysis as required by *BMW* helps avoid overdeterrence." *In re Exxon Valdez*, 270 F.3d at 1244. The court of appeals suggests that cleanup costs paid by Exxon, its casualty losses with respect to the *Exxon Valdez* and its cargo, the fine and restitution payments made by Exxon, and its settlement with various parties (approximately $3.4 billion) would go a long way toward effecting appropriate deterrence. *Id.* Apparently taking a cue from Justice Breyer's concurrence in *BMW*,[75] the court of appeals discusses how entrepreneurs do their planning, suggesting that they are deterred by the prospect of cleanup costs and the like. The appeals court concludes by observing, "[a]s bad as the oil spill is, fuel for the United States at moderate expense has great social value and that value as well as the value of avoiding horrendous oil spills can be reconciled by ratio analysis." *Id.*

---

**72.** There are, of course, no such plaintiffs in this case. However, we here discuss potential harm (*see TXO*, 509 U.S. at 460, 113 S.Ct. 2711) in a context where, because of a mandatory punitive damages class, all harm and all punitive damages possibly recoverable from the defendants are at issue.

**73.** For this reason, the court rejects Exxon's suggestion that a 2-to-1 ratio would be appropriate for this case.

**74.** In *TXO*, the ratio, without considering potential damages, was 526-to-1.

**75.** *BMW*, 517 U.S. at 593, 116 S.Ct. 1589 (Breyer, J., concurring).

The court of appeals' economic analysis makes sense in the abstract or academic world. That analysis reflects what well-informed, rational entrepreneurs would do. In the real world, Exxon and its officials and others like them quite likely do not work this way. If they did, they would remove the Captain Hazelwoods from the bridge because leaving them there is what creates a risk of horrendous cleanup costs and other expenses. Thus, what it theoretically takes to deter a rational business person (cleanup costs, etc.), and what it takes to deter corporate officials given to reckless conduct are very different. Here, we are dealing with reckless corporate officials.

The following considerations cause this court to believe that a higher ratio—one at about 10–to–1—presents no identified risk of over-deterrence. Firstly, a huge number of potential claimants suffered harm that was not purely economic. The harm struck at their livelihood. The health and safety of the *Exxon Valdez* crew and their rescuers were put at risk.

Secondly, the court is aware of no evidence in the record of this case suggesting that Exxon is able to pass its cleanup and other costs associated with the *Exxon Valdez* spill on to the public. Thus there is no showing that the deterrent effect of Exxon's costs (or the punitive sanctions) threatened the socially valuable availability of moderately priced fuel.[76]

Thirdly, it fairly requires a higher level of deterrence to capture and hold the attention of those given to reckless conduct than can be accomplished by the economic impact of bad business decisions.

Fourthly, the discussion thus far has said nothing about the financial circumstances of the defendants. Captain Hazelwood's financial circumstances are *de minimus*. He lost his job with Exxon as a consequence of the grounding of the *Exxon Valdez*. He is likely unemployable in his chosen profession except at the margins. He surely will never be the master of a large cargo vessel again because of the interrelated circumstances of his alcoholism and the wide publicity which attended the grounding of the *Exxon Valdez*.

Exxon on the other hand, at the time of the trial in 1994, was one of the five largest industrial corporations in the world.[77] For the years 1989–1993, its annual average revenue was $111.6 billion, its annual average net income was $4.83 billion, and its average annual net cash flow from operations was $10.1 billion.[78] After judgment was entered on the punitive damages award, Exxon's treasurer advised the court that "the full payment of the Judgment would not have a material impact on the corporation or its credit quality."[79] In fact, Exxon was able to protect itself from the risk of the plaintiffs executing on the $5 billion judgment by posting an irrevocable, syndicated standby letter of credit for over $6 billion.[80]

---

76. As already observed, cleanup costs have to do with environmental damage; and in this case, environmental damages have been excluded from the punitive damages determination and this court's ratio analysis.

77. Transcript of Trial Testimony of Jack Clarke (director and senior vice president of Exxon Corp.) at 7179, lns. 2–7, Excerpts of Record, Vol. I—Trial Transcript, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

78. *See* Exhibit PX6302A, Excerpts of Record, Vol. II—Trial Exhibits, attached to Plaintiffs' Opposition, Clerk's Docket No. 7501.

79. Declaration of Edgar A. Robinson at 16, ¶ 30, pertinent portion attached as Exhibit 33 to Oesting Declaration, which is appended to Plaintiffs' Opposition, Clerk's Docket No. 7501.

80. *See* Clerk's Docket No. 6914.

As the name implies, punitive damages are intended to punish and deter; they are not intended to be an economic death sentence. Over-deterrence in the form of punitive damages is inconsistent with the concept of reform as opposed to cessation of conduct. The contrast between the economic circumstances of Captain Hazelwood and Exxon are instructive in the foregoing regard. What is sufficient to effect just but not excessive deterrence of Captain Hazelwood, and what is sufficient to effect just and not excessive deterrence of the Exxon defendants are vastly different. Indeed, the loss of his employment with Exxon and the notoriety of the grounding of the *Exxon Valdez* almost surely effect the appropriate deterrence; and the $5,000.00 punitive damages award, given Captain Hazelwood's financial circumstances and one other factor, is sufficient punishment. That other factor is Captain Hazelwood's alcoholism. Alcoholism has long been recognized to be an illness. We do not normally punish people because of their illnesses; however, as to drunk drivers, disablement and some punishment is socially necessary because of the great damage inflicted upon society by drunk drivers. Given the circumstances of this situation, Captain Hazelwood has been effectively disabled from operating tank vessels, and a modest fine on top of that is adequate punishment, given his financial circumstances.

Exxon, on the other hand, is an economic powerhouse. Its profits, as discussed above, go into the billions of dollars each year. Its callous inattention to Captain Hazelwood's relapse and its reckless failure to remove him from command of the *Exxon Valdez*, knowing that he had relapsed into drinking, calls for major deterrence. There is absolutely no chance of a $5 billion punitive damages award amounting to an economic death sentence for Exxon. There is a good prospect that punitive damages in that amount will capture Exxon's attention for a long time. Since it is expected that Exxon and others will be transporting crude oil out of Valdez Arm and across Prince William Sound for many years into the future, a major message of deterrence was perceived necessary by the trial jury in this case and merits a punitive damages to total harm ratio at the high end of what is constitutionally permissible.

The foregoing discussion of deterrence says nothing about the coequal goal of punitive damages: punishment. The deterrence aspect of punitive damages is intended to be essentially forward-looking. The goal is to modify the future conduct of Exxon and others similarly situated. The punishment aspect of punitive damages awards is backward-looking. The law imposes sanctions for reckless conduct of the past. The concepts are therefore quite different and foster different societal goals.

.The harms visited upon the plaintiffs and punitive damages class members (both actual, likely to have occurred, and potential harm) are, for reasons discussed above, not entirely economic (as was the case in *BMW*) and are highly reprehensible. Thus, the applicable ratio of punitive damages to harm must be such as to accommodate not just the deterrence of reckless conduct in the future, but also punishment for the recklessness which gave rise to the harm.

The court concludes that the dual purposes of punitive damages (punishment and deterrence) and the circumstances of this case justify a 10–to–1 punitive damages to harm ratio. Considering all of the foregoing, the court is not persuaded that a punitive damages award of $5 billion amounts to excessive deterrence or excessive punishment of Exxon.

*Comparable Penalties.* The court turns now to the third *BMW* factor which involves comparing the punitive damages

award to the criminal and civil penalties that "could be imposed for comparable misconduct." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589. In *BMW,* the statutory sanctions which might have been imposed upon the defendant were much lower than the punitive damages award. In discussing this factor, the court of appeals observed that "[c]riminal fines are particularly informative because punitive damages are quasi-criminal." *In re Exxon Valdez,* 270 F.3d at 1245 (citing *Cooper Industries,* 532 U.S. at 432, 121 S.Ct. 1678).

■ In criminal proceedings brought against them by the federal government, the Exxon defendants were charged with five separate counts. Count I charged a violation of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1); Count II, a violation of the Refuse Act, 33 U.S.C. §§ 407 and 411; Count III, a violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a); Count IV, a violation of the Ports and Waterways Safety Act, 33 U.S.C. § 1232(b)(1); and Count V, a violation of the Dangerous Cargo Act, 46 U.S.C. § 3718(b).[81] Exxon Corporation pled guilty to Count III, and Exxon Shipping pled guilty to Counts I, II, and III. Pursuant to a joint plea agreement, Exxon was fined a net amount of $25 million and ordered to pay restitution in the amount of $100 million.[82] The net amount of the fine was affected by at least three considerations: (1) the plea agreement effected a settlement which avoided a difficult and expensive trial, (2) at the time of the disposition of the criminal case, this court did not have the benefit of the more robust development of actual damages which took place later in the civil proceedings, and (3) there were practical reasons why the court eschewed a larger fine in favor of a substantial restitution obligation. The court deemed it far preferable for Exxon to be sanctioned by means of a restitution obligation which would be employed for restoration of the environment than by a larger fine which would not be so employed. All of this said, the actual criminal penalty is not the proper criteria under *BMW.* We are engaged in a constitutional inquiry, the focus of which is the outer limits of potential sanctions that Exxon was charged with knowing prior to the grounding of the *Exxon Valdez.*

For each of the five criminal offenses brought against it, the Exxon defendants might have been fined "twice the gross [pecuniary] loss" occasioned by the oil spill. 18 U.S.C. § 3571(d). Laying aside harm likely caused by the oil spill which has not been quantified, and laying aside harm that might potentially have been occasioned by the spill had Captain Hazelwood succeeded in backing the *Exxon Valdez* off Bligh Reef, the court has found the actual pecuniary loss for purposes of *BMW* to be $507.5 million. That amount doubled, as provided by the statute, and multiplied by five offenses equals $5.1 billion.[83] Because Exxon is on notice of the provisions of the criminal laws of the United States, in particular 18 U.S.C. § 3571(d), it was, for constitutional due process purposes, on notice that criminal sanctions for spilling even a modest portion of the cargo of the *Exxon Valdez* could lead to truly horrendous criminal penalties. Perhaps

**81.** *See United States v. Exxon Corp.,* No. A90–0015–CR.

**82.** *See* Judgments at Clerk's Docket Nos. 235 and 236 in Case No. A90–0015–CR.

**83.** Exxon suggests that voluntary pre-judgment payments should be deducted when calculating a potential fine, just as those payments should be deducted when calculating the ratio under the second *BMW* factor. In this case, a reduction would be no more appropriate here than it was for purposes of calculating the ratio.

more important because we are concerned about notice of what *could be*, Exxon is fairly chargeable with knowledge that reckless conduct on its part could result in the spill of the entire cargo of a tank vessel such as the *Exxon Valdez*. While the court is not prepared to say that spilling the entire cargo of the *Exxon Valdez* would cause additional damage in direct proportion to that actually observed, spilling five times as much oil as was spilled would surely result in a significant increase in pecuniary losses. Surely Exxon knew that billions of dollars were at stake if it were to criminally spill a tanker-load of oil in Prince William Sound. Plainly those fines could exceed the jury's punitive damages award in this civil case.

Subsection 3551 of Title 18, United States Code, also provides for imprisonment.[84] While it is not possible to imprison a corporate defendant in a criminal case, provision for imprisonment is a recognized legislative signal of heightened seriousness of the offense, and therefore, for purposes of the *BMW* analysis, justifies a punitive damages award " 'much in excess of the fine that could be imposed.' " *BMW*, 517 U.S. at 583, 116 S.Ct. 1589 (quoting *Haslip*, 499 U.S. at 23, 111 S.Ct. 1032).

The Ninth Circuit Court of Appeals observed that "[c]eilings on civil liability are also instructive." *In re Exxon Valdez*, 270 F.3d at 1245. The court of appeals discussed the $100 million "cap" on liability for discharging oil from a vessel as provided by the Trans–Alaska Pipeline Act. 43 U.S.C. § 1653(c)(1) & (3). This limit upon liability is not in any sense a sanction, nor is it a limit on civil liability. It is, rather, an upper limit of *strict* liability for harms caused by non-negligent spilling of oil. Here, we deal with Exxon's reckless conduct and focus upon sanctions as to which the statutory limit of strict liability for non-negligent conduct is not instructive. In *BMW*, the Court suggests that a more appropriate consideration is exposure to civil penalties for wrongful conduct. *BMW*, 517 U.S. at 584, 116 S.Ct. 1589.

Both state and federal law make provision for the imposition of civil penalties for spilling crude oil into Prince William Sound. Alaska Statutes, Section 46.03.758, imposes civil penalties ranging from $1.00 per gallon to $10.00 per gallon, depending on where the oil is spilled. The plaintiffs estimate that state civil penalties for spilling 11 million gallons of oil in Prince William Sound would amount to $63.8 million, or an average of $5.80 per gallon.[85] Federal civil penalties of $270,000.00 could also have been imposed for the spill. *See* 16 U.S.C. §§ 668(b), 1858(a); 33 U.S.C. §§ 1232(a)(1), 1319(g), 1514(b)(3), 1908(b); 43 U.S.C. § 1350(b); and 46 U.S.C. § 3718(a)(1). Again, the foregoing presupposes the actual spill, whereas Exxon was fairly on notice that reckless conduct could cause the loss of the entire cargo thereby putting it at risk for state civil penalties approaching five times the civil penalty which would attend the actual spill. Such a civil penalty could be in excess of $255 million.

In consideration of the foregoing, the court is well satisfied that Exxon was quite fairly on notice that its officers could face imprisonment and the company could face in excess of $5 billion in criminal and civil penalties for recklessly spilling crude oil into Prince William Sound.

---

84. Exxon personnel with the authority and responsibility for placing a relapsed alcoholic in control of a large tank vessel might be imprisoned for up to one year. 33 U.S.C. §§ 407 and 411.

85. Plaintiffs' Opposition at 70, Clerk's Docket No. 7501. Exxon could have received an offset equal to the amount of oil it removed from the environment as part of cleanup efforts. *See* AS 46.03.758(f).

*Summary*

In its Order No. 267,[86] this court rejected Exxon's original motion for reduction or remittitur of the jury's $5 billion punitive damages award. The Supreme Court decision in *BMW* and *Cooper Industries,* as discussed in *In re Exxon Valdez,* necessitated reexamination of that determination. Based upon that reexamination and, it should be said, much more robust presentations from the parties with respect to the renewed motion for reduction or remittitur as to punitive damages, this court again concludes that a $5 billion award was justified by the facts of the case and is not grossly excessive so as to deprive Exxon of fair notice—its right to due process. This conclusion is based on the court's findings that:

(1) Exxon's conduct was highly reprehensible;

(2) the ratio of punitive damages to harm inflicted on the plaintiffs is a permissible one, 9.85–to–1; and

(3) the comparable criminal and civil penalties could have exceeded $5 billion.

However, the court of appeals did not just remand this case for application of *BMW* and *Cooper Industries.* It instructed this court to reduce the punitive damages award, and the court must do that. Determining the amount of an award that will be constitutionally acceptable " 'is not an enviable task.' " *Leatherman,* 285 F.3d at 1152 (quoting *Inter Medical Supplies,* 181 F.3d at 468). As the Third Circuit Court of Appeals explained:

We have searched vainly in the case law for a formula that would regularize this role, but have not found one. . . . [T]he Supreme Court has instructed as to the analysis but has provided nothing concrete as to the amount.

*Inter Medical Supplies,* 181 F.3d at 468.

██ Because the court's independent evaluation of the *BMW* factors as applied to the facts of this case have led it to the conclusion that the $5 billion award was not grossly excessive, the court does not perceive any principled means by which it can reduce that award. Plaintiffs' memorandum in opposition to the renewed motion for reduction or remittitur of punitive damages concludes with the following:

For the reasons stated above, the Court should deny Exxon's motion and determine that a punitive damage[s] award of at least $4 billion satisfies the requirements of due process consistent with *BMW v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).[87]

Since the $5 billion award must be reduced, the court adopts the plaintiffs' position as the means of resolving the conflict between its judgment and the directions of the court of appeals.

*Conclusion*

Exxon's motion for reduction or remittitur of the punitive damages award is granted. The sum of $1 billion of the $5 billion jury award is remitted, and therefore the punitive damages award in this case is reduced to $4 billion.[88] The clerk

---

**86.** Clerk's Docket No. 6234.

**87.** Plaintiffs' Opposition at 80, Clerk's Docket No. 7501.

**88.** If Exxon accepts this result by paying the punitive damages award plus accrued interest, this case should of course end at that point. However, if Exxon chooses to take a further appeal for the purpose of seeking a

more generous reduction of the jury's punitive damages award, then the court urges the plaintiffs to cross-appeal, for, if left to apply *BMW* without the requirement that it effect some reduction of the $5 billion punitive damages award, this court would have, as set out above, denied Exxon any relief whatever on its second motion for reduction or remittitur of punitive damages.

of court shall enter judgment according-ly.[89]

89. Interest on the reduced award of punitive damages shall accrue from September 24, 1996, in accordance with 28 U.S.C. § 1961.